**7979 AIRPORT GARAGE,
L.L.C., Appellant,**

v.

**DOLLAR RENT A CAR SYSTEMS,
INC., Appellee.**

No. 14–05–00484–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

April 27, 2007.

Joseph O. Slovacek, Jennifer Bruch Hogan, Matthew E. Coveler, Thomas Michael Pickford, Richard P. Hogan, Houston, for appellant.

Jason Andrew Braun, Patricia L. Casey, Houston, Kendyl Hanks Darby, Dallas, for appellee.

Panel consists of Chief Justice HEDGES and Justices YATES and GUZMAN.

## OPINION ON REHEARING

EVA M. GUZMAN, Justice.

We grant appellant's motion for rehearing in part, overrule it in part, withdraw our opinion of October 3, 2006, and issue this opinion on rehearing.

In this action on a commercial lease, the parties dispute whether the lease requires costs that certain repairs to a parking garage be paid by the property's owner, 7979 Airport Garage, L.L.C. ("7979"), or the lessee, Dollar Rent A Car Systems, Inc. n/k/a DTG Operations ("Dollar"). Appellant 7979 argues that the evidence is legally and factually insufficient to support the jury's verdict in Dollar's favor on its claims for breach of contract, breach of the implied warranty of suitability, and damages. 7979 argues alternatively that either Dollar or the prior owner of the parking garage is responsible for the costs of repairs, and that Dollar is estopped from asserting its claims against 7979. Finally, 7979 contends the trial court erred in awarding unsegregated attorneys' fees to Dollar, and that, in any event, the fees are excessive. We conclude that the lease unambiguously requires 7979 to pay for the repairs at issue, and thus, Dollar may recover its actual damages and the attorneys' fees it incurred to defeat 7979's counterclaims and recover on the contract. We therefore affirm the portion of the judgment incorporating the jury's finding that 7979 is liable to Dollar for actual damages in the amount of $16,037.20, and that Dollar is not liable to 7979. But because Dollar failed to segregate the attorneys' fees it incurred in prosecuting its breach of contract claim and defending against 7979's counterclaims from those fees it incurred solely in connection with its breach of warranty claim, we reverse the portion of the judgment awarding attorneys' fees,

sever this issue from the remainder of the judgment, and remand this issue to the trial court for further proceedings consistent with this opinion. In light of our disposition of this issue, we do not reach 7979's claim that the fee award is excessive.

### I. FACTUAL AND PROCEDURAL HISTORY

Dollar operates a car rental agency and three-story parking garage (the "Garage") near Hobby Airport on premises formerly leased from ARE Holdings, L.L.C. d/b/a Parking Company of America ("PCA").[1] The fifteen-year Lease provides in pertinent part:

17.a. Lessor shall keep the foundation, the exterior walls (except plate glass windows, doors, door closure devices, window and door frames, molding, locks and hardware and painting or other treatment of the interior surface of exterior walls) and roof (excepting any leaks or damage caused by Lessee, Lessee's employees or agents) of the Leased Premises in good repair except that Lessor shall not be required to make any repairs occasioned by the act or negligence of Lessee, Lessee's agents, employees, subtenants, licensees, invitees, customers and concessionaires, which repairs shall be made by Lessee. In the event that the Leased Premises should become in need of repairs required to be made by Lessor hereunder, Lessee shall give immediate written notice thereof to Lessor and Lessor shall not be responsible in any way for failure to make any such repairs until a reasonable time shall have

1. Dollar is the successor by merger to the original tenant under the lease.

elapsed after delivery of such written notice.

17.b. Lessee shall keep the Leased Premises in good repair and condition and shall at Lessee's sole cost and expense, make all needed repairs and replacements, including replacement of cracked or broken glass, except for repairs and replacements required to be made by Lessor herein and shall keep all plumbing units, pipes and connections free from obstruction and protected against ice and freezing. During the Lease Term, Lessee shall keep the Leased Premises, including the floors of the Garage, clean, neat, and orderly and free from all grease, oil, ashes, dirt and other refuse or matter. Lessee shall make no alterations or additions without obtaining the prior written consent of Lessor which shall not be unreasonably withheld. Any addition to, or alteration of the Leased Premises, except movable furniture and removable trade fixtures, shall become at once a part of the Garage and belong to the Lessor. If any repairs required to be made by Lessee are not made within fifteen (15) days after written notice is delivered to Lessee by [L]essor, Lessor at Lessor's option may make such repairs. Lessee shall pay to Lessor the reasonable cost of such repairs within thirty (30) days after receipt of [the] bill for repairs.

PCA paid for temporary repairs to the expansion joints in the building in 1998 and 2000. As engineer Henry Segura explained:

[Expansion joints are gaps left in the concrete floor of the building] to remove stress build-up due to temperature growth of the building. This growth, or elongation can tear a building apart, unless properly accounted for. An air gap that offers no resistance to elongation load makes an excellent method of elimination of stress. Vertical load transfer at an expansion joint, then becomes very important in the design of a successful joint.

The expansion joints divide the Garage in a north-south direction near the center of the building. The 1998 repairs were considered temporary because "not all design information [was] properly documented at that time." The engineer supervising the repairs stated that the repair "may be used for an extended period, but should be monitored for elongation, etc."

In December 2000, Dollar negotiated with PCA to buy the Garage for $5.55 million. As a prospective purchaser, Dollar retained the engineering services of Walter P. Moore & Associates, Inc. ("Moore") to survey the Garage and state its opinion "on the [Garage's] current overall structural condition...." On December 26, 2000, Moore produced its findings in a Structural Due Diligence Review (the "Moore Report"). Under the heading "Observations—Structural," the Report states:

Repair/Replace existing transverse expansion joint: Significant deterioration of both the concrete and the expansion joint material on Levels 2 and 3 is visible. Previous repair attempts were not installed properly and are not currently functioning as needed. Problem conditions with these expansion joints include: loose and spalled concrete, loosened nuts for the bolts attaching the angles to the concrete deck, wallowed bolt holes in the concrete deck, and torn and separated

expansion joint material over the joint itself. The entire expansion joint system should be thoroughly reviewed and we anticipate that the repairs would include: proper attachment of the load transfer angles, replacement of the damaged expansion joint material and repair of unsound concrete.

The Moore Report advised that this project "should be addressed immediately or within 1 year." Dollar promptly sent the report to PCA and to Scott Word, PCA's real estate broker.

On or about January 5, 2001, Dollar received a proposal from Kirkconnell Maintenance to perform the recommended work (the "Kirkconnell Estimate"). According to the Kirkconnell Estimate, the following four services were required to remedy the problems with the expansion joints:

Service 1: Replace Wide Joints at two levels[,] complete width of garage $16,500.00

Service 2: Repair concrete decks at the above joints $12,000.00

Service 3: Repair Column-light pole detail at same joint $7,500.00

Service 4: Remove existing [sic] and Install Anti Deflection System at same joints $36,000.00

Total[:] $72,000.00

Total with local Tax[:] $77,940.00

Dollar sent the Kirkconnell Estimate to PCA and Scott Word on January 8, 2001. In response to the Estimate, PCA offered to reduce Dollar's purchase price for the Garage by $50,000.00. The final agreed price for Dollar's purchase of the Garage was $5.5 million.

For reasons unrelated to the Garage's structural condition, Dollar notified PCA on January 25, 2001 that it would not proceed with the sale.[2] Although PCA was aware the expansion joints would require extensive work at some point in the future, PCA did not begin the project immediately; however, Dollar did not consider PCA to be in default on the Lease. Under the terms of the Lease, an "event of default" occurs when "[e]ither party shall fail, after ten (10) days' written notice, to comply with any other term, provision or covenant of this Lease."[3] Although the Moore Report provided PCA with written notice of the structural problems at the expansion joints, Dollar did not consider PCA to be in default because, according to the Moore Report, the project could be addressed "within one year."

7979 subsequently negotiated with PCA to purchase the Garage.[4] The negotiations were conducted through Word, who acted as the real estate agent for both PCA and 7979. Word sent 7979 the Moore Report and the Kirkconnell Estimate on February 13, 2001. However, at some point in the five weeks between receiving the Kirkconnell Estimate from Dollar and conveying it to 7979, Word had added hand-written notations to the Estimate. Next to Service 1, Word wrote "could be half." Beside Service 2, Word wrote "pd. for by PCA, [Dollar] [illegible] and supervised."[5] Next to Service 3, Word wrote "cosmetic." Word also drew a bracket extending from or connecting Service 2 to Service 4, and beside the bracket he wrote

2. Dollar's agreement to purchase the Garage was conditioned on the approval of Dollar's board of directors, and the board failed to approve the purchase.

3. The Lease defines eight other events of default, but these are not relevant to the case.

4. Empire State Collateral negotiated the purchase, and formed 7979 days prior to closing. For the sake of clarity, we refer to both entities as 7979.

5. Word was asked to decipher this note at trial and was unable to do so.

"was performed by [Dollar's] vendor. Supervised by [Dollar] and paid by [PCA]." According to Word's testimony at trial, 7979's principal, Armand Laskey, asked Word the meaning of the handwritten notes, and Word responded that the notes refer to similar repairs that had been performed on the Garage in 1997 or 1998. According to Word, he made the notes when discussing the Kirkconnell Estimate with PCA and proposing a $50,000.00 reduction in Dollar's purchase price of the Garage. Word testified that he did not tell 7979 the services listed in the Kirkconnell Estimate were no longer needed. He also denied making any representations to 7979 that the work identified in the Moore Report had been performed or still needed to be performed. Laskey, however, testified that he construed Word's notes to mean that the work on the expansion joints referenced in the Moore Report and the Kirkconnell Estimate had already been performed. According to Laskey, Word assured him the work had been done.

On April 19, 2001, 7979 executed a written offer to purchase the Garage. Under the terms of the agreement, 7979 had thirty days to inspect the property. The purchase agreement was subject to a rider, stating:

> [PCA] acknowledges that [7979] has advised [PCA] of Structural departs [sic] a[s] set forth in the report prepared by Walter P. Moore dated December 26, 2000 (the "Report").... The Property is in good operating condition and repair, subject only to ordinary wear and tear and the matters set forth in the Report.

Word and Laskey subsequently inspected the Garage. According to Laskey, there were no problems at the Garage at that time. 7979 also had the Garage independently appraised. The appraisal was based in part on an inspection of the Garage and a review of the Moore Report. The appraiser noted that in valuing the Garage, he assumed the Moore Report was correct, and appraised the property at $7.2 to $8.7 million on an "as is" basis. The appraiser specifically described the expansion joints as "deferred maintenance item[s]." The appraiser also stated, "The lease requires Dollar Rent A Car to reimburse Lessor for all property expenses, except major structural repairs to the building...."

After 7979's thirty-day inspection period passed, but before closing the sale, 7979 requested an estoppel certificate from PCA. Dollar provided an estoppel certificate to PCA on June 19, 2001, and PCA immediately forwarded it to 7979.[6] The certificate reads in pertinent part:

> [T]here are not, to the tenant's knowledge, (i) any uncured defaults on the part of the landlord or the tenant under the lease, (ii) any existing offset[s] or counterclaim[s] against the tenant's obligation to pay rent under the lease, or (iii) any defense[s] to the landlord's enforcement of the tenant's obligations under the lease.

At trial, Laskey testified that 7979 relied on the estoppel certificate in completing the purchase.

During the sales negotiations between PCA and 7979, PCA continued to reimburse Dollar for prior repairs to the expansion joints.

On June 20, 2001, PCA and 7979 executed an "Assignment and Assumption of Lease." The Assignment contains the following terms:

> [7979] hereby (i) accepts the Assignment of the Lease; (ii) agrees to be

---

6. Under the terms of the Lease, Dollar was required to provide PCA with an estoppel certificate upon request. PCA therefore requested an estoppel certificate from Dollar.

bound by and to perform all of the terms, covenants and obligations on tenant's [sic] part to be performed under the Lease from and after the date hereof; and (iii) agrees to assume all obligations of [PCA] thereunder on and after the date hereof.

The witnesses at trial agreed there were no holes in the Garage on June 20, 2001; however, expansion joint defects began to necessitate repairs on or about August 13, 2001. Nonetheless, Dollar did not inform PCA or 7979 of the increasing urgency of necessary repairs at that time.

On August 15, 2001, 7979 purchased the Garage for $5.35 million, "subject to [the Moore Report]." Neither 7979 nor Dollar arranged to have the work described in the Moore Report performed by December 26, 2001, as the Moore Report recommended.

On February 28, 2002, Dollar wrote to 7979 as follows:

> The prior owner of this property ... was put on notice in December 2000 that there was a structural problem at this property. We provided a proposal to repair the [expansion] joints at the property to the prior owner in January 2001 ... [W]e are putting you on notice that we expect the landlord/owner to pay for the repair....

Dollar attached an updated estimate from Kirkconnell. According to Susan Speaker, Dollar's director of properties and concessions, she spoke with Laskey, who agreed that 7979 would pay for the work. In contrast, Laskey testified that he told Speaker he thought the repairs had been done, but added that 7979 would do the repairs if it was 7979's responsibility to do so.

Speaker wrote to 7979 again on April 3, 2002, asking when 7979 expected to make the repairs. 7979 did not respond to the letter. According to Speaker, she spoke with Laskey on April 10, 2002, and Laskey asked her to obtain the names of additional potential contractors to perform the work. On May 2, 2002, Speaker again wrote to 7979, relaying the names of two more contractors and again enclosing the updated Kirkconnell Estimate. 7979 did not make the repairs, and at no time prior to the filing of this suit did 7979 assert that the work was Dollar's responsibility or demand that Dollar pay for the repairs.

Dollar again hired Moore to survey the expansion joints, and in accordance with Moore's instructions, Dollar paid a contractor to install barricades around and safety netting below the damaged expansion joints to prevent concrete debris from falling from or through the gaps and striking automobiles, customers, or employees. Dollar also hired a law firm to sue 7979 for breach of contract and breach of warranty, and to obtain a declaratory judgment.

Six months after Dollar filed suit, contractors hired by 7979 began work on the expansion joints. The final project as ultimately bid and performed at 7979's expense included barricades, signs, traffic barriers, temporary support of work, and the protection of existing construction during cutting and patching to prevent damage. The work was finished in March of 2003 at a cost of $165,863.41. 7979 paid for the repairs, but refused to reimburse Dollar for monies Dollar expended on Moore's May 2002 inspection and the installation of barricades and safety netting.

In the meantime, 7979 filed an answer to Dollar's suit on July 24, 2002, and amended its answer on September 6, 2002. In April 2003, after the work to the expansion joints was completed, the parties entered a Rule 11 agreement resetting the trial to September or October 2003. On August 15, 2003, 7979 amended its answer a third time, added counterclaims for fraud, breach of contract, and sanctions, alleging

that Dollar filed suit in bad faith. On October 1, 2003, the trial court ordered the case reset for trial, and the following day, 7979 amended its answer a fourth time and amended its counterclaims to allege false representation or failure to disclose material facts. After the case was again reset for trial, 7979 amended its answer a fifth time and its counterclaims a second time.

In October of 2004, the case was tried to a jury, and judgment was rendered in favor of Dollar for actual damages of $16,037.20 plus pre-judgment and post-judgment interest. In addition, Dollar was awarded attorneys' fees of $340,000.00, and conditional attorneys' fees of up to $90,000.00, depending on the number of appeals.[7] The trial court denied 7979's motion for judgment notwithstanding the verdict and its motion for new trial, and this appeal ensued.

## II. ISSUES PRESENTED

7979 presents ten compound issues for our review. We have grouped these issues substantively by first addressing the issues that pertain to Dollar's causes of actions, and then addressing 7979's affirmative defenses and counterclaims. Finally, we discuss 7979's challenges to the proof of actual damages and the award of attorneys' fees. When both legal and factual sufficiency points are raised, we address the legal sufficiency points first. *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981).

In its first and ninth issues, 7979 attacks the jury's findings regarding its breach of contract. Specifically, in its first issue, 7979 challenges both the legal and factual sufficiency of the evidence supporting the jury's finding that 7979 failed to comply with the Lease; alternatively, 7979 argues that the Lease and record conclusively establish that Dollar is responsible for the repair costs at issue. Similarly, 7979 argues in its ninth issue that it conclusively established that 7979 paid for repairs that were Dollar's responsibility. Alternatively, 7979 contends that the jury ignored the great weight and preponderance of the evidence in failing to find that 7979 paid for repairs that were Dollar's contractual responsibility.

In its third and fourth issues, 7979 attacks the jury's finding that 7979 breached the implied warranty of suitability. 7979 asserts in its third issue that the evidence is legally and factually insufficient to support this finding, and in its fourth issue, 7979 argues that only PCA can be liable to Dollar for such a breach.

In issues five, six, and seven, 7979 challenges the jury's failure to find that Dollar was estopped from asserting that 7979 breached the Lease or the implied warranty of suitability, or that such breaches were otherwise excused. 7979 phrases this in its fifth issue as a challenge to the legal and factual sufficiency of the evidence supporting the jury's findings that these breaches were not excused, and in its seventh issue, 7979 contends that the Estoppel Certificate defeats Dollar's claims. In its sixth issue, 7979 similarly contends that Dollar is legally or equitably estopped from asserting its breach of contract action.

---

7. The jury found that Dollar incurred reasonable fees for necessary services "in this case" in the amount of $340,000 for preparation and trial, $40,000 for an appeal to the Court of Appeals, $10,000 if a petition for review was filed in the Texas Supreme Court, and $40,000 if such a petition for review was granted. 7979 sought $200,000.00 for its attorneys' fees through trial, $48,000.00 for legal fees in the event of an appeal to the Court of Appeals, $20,000.00 in the event of a motion for rehearing or petition for review was filed, and $40,000.00 if the Texas Supreme Court granted review.

7979 argues in its second issue that the trial court improperly denied 7979's post-verdict motions asking the trial court to disregard the jury's answers to ten specific questions. These issues primarily pertain to 7979's counterclaim for breach of contract. In its eighth issue, 7979 asserts that the evidence is legally and factually insufficient to support the jury's finding that Dollar incurred $16,037.20 to make repairs that were 7979's contractual responsibility. Finally, in its tenth issue, 7979 attacks the award of attorneys' fees on the grounds that they are unsegregated and excessive.

### III. STANDARD OF REVIEW

The test for legal sufficiency is whether the evidence at trial "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we must view the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. We assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences. *Id.* at 821. We cannot substitute our judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *See id.* at 822. We will sustain a legal sufficiency challenge only when (1) the record discloses the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. We apply this standard both to a direct challenge to the jury's verdict and to the trial court's denial of a motion notwithstanding the verdict. *See id.* at 823; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003) (per curiam) ("A trial court may grant a judgment notwithstanding the verdict if there is no evidence to support one or more of the jury findings on issues necessary to liability.").

When considering a factual sufficiency challenge to a jury's verdict, we must review and weigh all the evidence, not just the evidence that supports the verdict. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 768–69 (Tex.App.-Houston [14th Dist.] 2004, no pet.). We may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *See Mar. Overseas Corp.*, 971 S.W.2d at 407; *Nip*, 154 S.W.3d at 769.

### IV. ANALYSIS

#### A. 7979's Breach of the Lease

7979 argues on appeal that the evidence is both legally and factually insufficient to support the jury's finding that 7979 failed to comply with the Lease. According to 7979, paragraph 17 of the Lease unambiguously requires 7979 to make repairs only to the foundation, exterior walls, and roof, and requires Dollar to make all other repairs or replacements. Under the appropriate standard of review, 7979's claims are meritorious only if the Lease (a) is ambiguous, and extrinsic evidence is insufficient to support the jury's conclusion that the parties to the Lease intended the landlord to bear these costs, or (b) is unambiguous and requires Dollar to bear the costs of repairing the expansion joints.

Our primary concern in interpreting a contract is ascertaining the true intent of the parties as expressed in the

instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996); *Hewlett–Packard Co. v. Benchmark Elecs., Inc.*, 142 S.W.3d 554, 561 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). We examine the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Hewlett–Packard*, 142 S.W.3d at 561. We presume that the parties to a contract intend every clause to have some effect. *Heritage Res.*, 939 S.W.2d at 121. We give terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense. *Id.* "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *J.M. Davidson, Inc.*, 128 S.W.3d at 229. We construe a contract by determining how the "reasonable person" would have used and understood its language, considering the circumstances surrounding the contract's negotiation and keeping in mind the purposes intended to be accomplished by the parties when entering into the contract. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 127–28 (Tex.App.-Houston [14th Dist.] 1997), *aff'd sub nom, Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 20 S.W.3d 692, 704 (Tex.2000).

■ Here, the purpose the parties intended to accomplish is set forth in the Lease itself: the landlord is required to construct, and the tenant is required to operate, a three-story "first-class parking facility." Specifically, the landlord is required to construct a three-story parking garage of approximately 293,000 square feet, insure the building against loss or damage for its full replacement value, and lease it to the tenant for fifteen years. The tenant is permitted to use 2,200 square feet to operate a car rental business, and must "operate the remainder of the Garage as a first-class parking facility. . . ." The tenant is required to "maintain the highest standards in the operation of the Garage so that the Parking Facility shall be operated in a fashion comparable to other first-class parking facilities in similar type buildings in the Houston area." The tenant is also required to "provide all materials, supplies and equipment needed for the proper and efficient use and operation of the Garage" and "use its best efforts to maintain and develop the Garage and to increase the volume of business for the same, and not to divert or cause to be diverted any business from the Garage to other parking facilities. . . ."

As part of its obligation to operate a first-class parking facility, the tenant is required to provide, maintain and operate at least four shuttle vehicles to carry parking customers between the Garage and Hobby Airport Terminal, and to "operate such vehicles at all times necessary to provide prompt service." The tenant is required to pay the landlord the first $28,000.00 of net parking revenue, and any amounts due for guaranties, marketing expenses, taxes, or insurance. The tenant is then required to pay the landlord forty percent of the next $22,0000.00 of net parking revenue, and fifty percent of any remaining net parking revenue.

Reading the Lease as a whole, we disagree with 7979's contention that paragraphs 17a and 17b of the Lease unambiguously restrict the landlord's repair obligations to the foundation, exterior walls, and roof, and require Dollar to bear the cost of any other repair or replacement, regardless of its nature. 7979's

interpretation would permit the lessor to construct the outer shell of the building and leave the second and third floors in an incomplete or defective state, thereby transferring the cost of properly completing construction to the tenant. Thus, this interpretation would contradict the allocation of responsibilities expressly provided for in the Lease.

7979's interpretation is also inconsistent with the parties' allocation of the risk of loss as shown in the Lease's insurance requirements. The tenant is required to insure its own property, the property of its customers, and its public liability, but is not required to insure any part of the Garage. The landlord is required to maintain insurance "for the full replacement value of the Garage" in the event of its loss or damage—even though, under 7979's interpretation of the Lease, the tenant is required to repair or replace essentially the entire interior of the building.

▇▇▇▇ Finally, 7979's interpretation effectively exempts the second and third floors of the Garage from the implied warranty of suitability without express language to that effect.[8] This interpretation is contrary to Texas law, which provides that a tenant waives latent defects only if he takes the premises "as is" or expressly assumes the obligation to repair.[9]

We disagree that a reasonable person would interpret the language of the Lease in the manner urged by 7979. On the contrary, the only reasonable interpretation of the relevant language is that the landlord must make structural repairs to the Garage, and must repair the foundation, exterior walls, and roof, even if the damage to these areas is not physical or structural (for example, if the damage is merely cosmetic).[10] Because the interpre-

---

8. When an agreement is silent or obscure as to a particular subject, the law and usage become a portion of it and constitute a supplement to it and interpret it. *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 144 Tex. 475, 191 S.W.2d 716, 724 (1946); *Panama–Williams, Inc. v. Lipsey*, 576 S.W.2d 426, 431 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.). Part of the law in effect at the inception of the Lease was the law governing the implied warranty of suitability. "This warranty means that at the inception of the lease there are no latent defects in the facilities that are vital to the use of the premises for their intended commercial purpose and that these essential facilities will remain in a suitable condition." *Davidow v. Inwood N. Prof'l Group—Phase I*, 747 S.W.2d 373, 377 (Tex.1988). This is so because "commercial tenants generally rely on their landlords' greater abilities to inspect and repair the premises." *Id.* at 376.

9. *Gym–N–I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 909 (Tex.2007) (enforcing an express waiver of the warranty of suitability in a lease in which the tenant took the property "as is"); *Davidow*, 747 S.W.2d at 377 (stating that if "the parties to a lease expressly agree that the tenant will repair certain defects, then the provisions of the lease will control.").

10. In its motions for rehearing, 7979 argues that such a result is inconsistent with this court's opinion in *Chen v. RB & RB Invs., Inc.*, No. 14–02–00178–CV, 2003 WL 297674, at *1 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (mem.op.) (imposing the duty to repair electrical wiring on the lessee when both the landlord and the lessee were aware of the problems with the wiring, and the lessee took the premises "as is"). Although the facts in *Chen* are readily distinguished from those presented here, our reasoning in both cases is consistent. In *Chen*, we stated that, "[b]y mentioning *only structural components* of the premises in describing the landlord's duties, we cannot construe the lease as Chen suggests to include the wiring as well." (emphasis added). Here, the lease similarly mentions only structural components in describing the landlord's duties, but unlike the electrical problems in *Chen*, the defect in this case is also a structural component. *See also Schulze v. C & H Builders, Inc.*, 761 S.W.2d 219 (Mo.Ct.App.1988) (holding that cracks in a garage floor were a latent structural defect); *Trapalis v. Gershun*, 259 Iowa

tation urged by 7979 is unreasonable and inconsistent with the overall allocation of risks and responsibilities demonstrated throughout the remainder of the Lease, we conclude the Lease unambiguously allocates the costs of the repairs at issue to the landlord. *See Universal Health Servs. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex.2003) (explaining that a contract is ambiguous if it is subject to two or more "reasonable" interpretations after applying the pertinent rules of construction).[11]

7979's first issue, challenging the legal and factual sufficiency of the evidence supporting the jury's finding that 7979 failed to comply with the Lease, is overruled. For the same reasons, we hold 7979 did not conclusively establish that Dollar is responsible for the costs of repairs, and overrule 7979's ninth issue.

### B. 7979's Breach of the Implied Warranty of Suitability

7979's third issue challenges the legal and factual sufficiency of the evidence supporting the jury's finding that 7979 breached the implied warranty of suitability. In its fourth issue, 7979 makes the related argument that any breach of the implied warranty occurred prior to 7979's ownership of the property. In support of this argument, 7979 relies on paragraph 42 of the Lease, which states: "Lessee shall look solely to the then owner of the Leased Premises at the time of the breach or default for the satisfaction of any remedies of Lessee."

### 1. Elements of the Implied Warranty of Suitability

 The implied warranty of suitability "means that at the inception of the lease there are no latent defects in the facilities that are vital to the use of the premises for their intended commercial purpose and that these essential facilities will remain in a suitable condition." *Davidow v. Inwood N. Prof'l Group—Phase I*, 747 S.W.2d 373, 377 (Tex.1988). A landlord may be liable for breach of this warranty if the evidence shows that: (1) the landlord leased property to the tenant, (2) the lease covered commercial property, (3) the leased property had a latent physical or structural defect[12] at the inception of the lease,[13] (4) the defect was in an area that was vital to the property for its intended commercial purpose,[14] (5) the defect made the property unsuitable for its intended commercial purpose, and (6) the tenant suffered injury. Factors the trier of fact may consider in determining whether there has been a breach of the implied warranty of suitability include[15] the nature of the defect;[16] its effect on the tenant's

---

775, 145 N.W.2d 591 (Iowa 1966) (holding that, if the lease required the landlord to maintain the exterior of the roof, structural walls, and sidewalks in good repair, then the landlord was liable to tenant for demolishing an unsafe building instead of strengthening the foundation, foundation walls, and bearings for the floor joists).

**11.** Because the Lease is unambiguous, the trial court erred in submitting a jury question asking if 7979 failed to comply with the Lease; however, the jury answered the question in the affirmative, and thus, the error is harmless.

**12.** *Coleman v. Rotana, Inc.*, 778 S.W.2d 867, 871 (Tex.App.-Dallas 1989, writ denied).

**13.** *Davidow*, 747 S.W.2d at 377.

**14.** *Id.* at 374–75.

**15.** *Id.* at 377.

**16.** *Parts Indus.Corp. v. A.V.A. Servs., Inc.*, 104 S.W.3d 671, 680 (Tex.App.-Corpus Christi 2003, no pet.) (leaky roof in warehouse); *Neuro–Developmental Assocs. of Houston v. Corporate Pines Realty Corp.*, 908 S.W.2d 26, 27 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (malfunctioning heating and air condi-

use of the premises;[17] the length of time the defect persisted;[18] the age of the structure; the amount of the rent; the area in which the premises are located; whether the tenant waived the defects; and whether the defect resulted from any unusual or abnormal use by the tenant.

### 2. Evidence Relevant to the Breach of the Implied Warranty of Suitability

■■■■■ A latent defect is one not discoverable by a reasonably prudent inspection of the premises at the inception of the lease.[19] By its terms, the Lease became effective when the Garage was "substantially complete"; therefore, the problem with the expansion joints was a latent defect only if the joints were defective, and the defect was undiscoverable by a reasonably prudent inspection when the Garage was substantially complete.

Here, the expansion joints essentially connect the two halves of the building, and problems with the expansion joints have been repeatedly characterized as "structural" by the engineering experts and the parties. A 1998 engineering report suggests that the expansion joints were inadequate to properly support the shuttle buses that Dollar is required to operate. There is no evidence that the defect was discovered before 1998, and no evidence that problems with the expansion joints rendered any part of the Garage unsuitable for its intended operations until after 7979 assumed the Lease. According to the evidence presented at trial, problems caused by the expansion joints temporarily caused the closure of nearly half of the parking spots in the Garage.[20] Shuttles could not traverse parts of the Garage, and Dollar's customers were directed away from certain areas to avoid the defect. Thus, on the record before us, we conclude that a reasonable jury could find that (a) the expansion joints were defective at the Lease's inception, (b) the defect made parts of the Garage unsuitable for the operation of shuttles as intended, (c) the defect could not have been discovered until after the Garage was substantially complete and Dollar began to operate the shuttles, and (d) Dollar was injured by 7979's failure to maintain the property.

In a related argument, 7979 contends that Dollar is responsible for the repair costs because the damage was caused by Dollar's own operations. In support of this argument, 7979 relies on a 1998 report by an engineer who inspected the expansion joints and provided temporary repairs. In this report, the engineer stated, "As heavier vehicles drive across the gaps, a vibration is set up.... The vibration from the impact has in some areas, loosened the concrete floor topping." According to 7979, Dollar caused the damage by operating shuttles and is therefore required to pay for the repairs. But the Lease requires Dollar to operate at least four shuttle vehicles "at all times necessary to provide prompt service." These operations are part of the intended purpose of

---

tioning in clinic treating physical and speech handicaps of infants and children); *Ruiz v. Hilley*, No. 14–94–00635–CV, 1996 WL 580940, *2–3 (Tex.App.-Houston [14th Dist.] 1996, no writ) (not designated for publication) (problems with air conditioning, one toilet, leaking roof, and lack of insulation in church).

**17.** *Davidow,* 747 S.W.2d at 375 ("Patients were directed away from certain areas during rain so that they would not be dripped upon in the waiting room.").

**18.** *Id.* at 374–75.

**19.** *See Gupta v. Ritter Homes, Inc.,* 646 S.W.2d 168, 169 (Tex.1983).

**20.** At its worst, immediately before the repairs were performed, the damage rendered 298 of the Garage's 618 spaces unusable.

the Garage, and the implied warranty of suitability requires the landlord to construct and maintain the Garage in a manner suitable for these operations.

We overrule issues three and four.

## C. Estoppel

■■■ 7979 argues that Dollar is estopped from asserting claims against it because Dollar's estoppel certificate recites that the prior owner is not in default, and Dollar did not attach the Moore Report to the estoppel certificate. To prevail on its affirmative defense that Dollar is equitably estopped from asserting its claims, 7979 was required to produce evidence of the following: (1) a false representation or concealment of material facts, (2) made with actual or constructive knowledge of those facts, (3) with the intention that the representation should be acted on, (4) the representation was made to a party who was without knowledge or means of obtaining knowledge of the real facts, and (5) the party to whom the representation was made detrimentally relied on the representations. *See Johnson & Higgins v. Kenneco Energy,* 962 S.W.2d 507, 515–16 (Tex. 1998).

■■■ Here, at a minimum, elements 1, 2, 4, and 5 are unsupported by evidence. At the time Dollar signed the estoppel certificate on June 19, 2001, the landlord had not failed to make repairs that were requested and required either by the condition of the premises or the Moore Report. Accordingly, Dollar's statement that there were no "uncured defaults" on June 19, 2001 did not constitute a false representation or a concealment of material fact made with actual or constructive knowledge of the true conditions.[21]

In addition, 7979 was not "a party without knowledge or means of obtaining

knowledge of the real facts." To the contrary, 7979 was aware that the expansion joints needed to be repaired by December 26, 2001 because 7979 had been given a copy of the Moore Report more than four months before the estoppel certificate was signed. 7979 also had the Garage independently appraised before the purchase, and the appraiser incorporated and relied on the Moore Report. Finally, 7979 did not rely on the estoppel certificate to show that there was no need for structural repairs, but entered into the purchase agreement expressly subject to the Moore Report.

In its sixth and seventh issues, 7979 argues that Dollar is estopped from asserting its claims of breach of contract and breach of the implied warranty of suitability due to misrepresentations or omissions from the estoppel certificate. 7979 rephrases the same question in its fifth issue, challenging the jury's finding that 7979's breaches of contract and warranty were not excused. Because there is no evidence supporting several essential elements of estoppel, we overrule issues five through seven.

## D. Dollar's Breach of the Lease

7979 also contends that the jury found that Dollar failed to comply with the Lease, but awarded no damages for the breach. Essentially, 7979 argues that the two jury findings are inconsistent and conflicting.

■■■ When determining whether jury findings conflict, the threshold question is whether the findings address the same material fact. *Bender v. S. Pac. Transp. Co.,* 600 S.W.2d 257, 260 (Tex. 1980). We may not strike jury answers on the ground of conflict if there is any rea-

---

**21.** We also note that Dollar did not make the

"representation" at issue to 7979, but to PCA.

sonable basis upon which they can be reconciled in light of the pleadings and evidence, the manner of submission, and the other findings considered as a whole. *Ford Motor Co. v. Miles*, 141 S.W.3d 309, 314–15 (Tex.App.-Dallas 2004, pet. denied).

■ 7979 argues that Dollar breached the Lease by failing to provide 7979 with immediate notice of the need for repairs. Testimony at trial showed there were no holes in the Garage before July 20, 2001, the date on which 7979 assumed the Lease. Repairs were actually required on or about August 13, 2001, and Dollar demanded repairs on February 28, 2002, approximately two months after the date suggested in the Moore Report as the deadline for completion of the repairs. Hence, the jury's finding that Dollar failed to comply with the Lease is supported by evidence that Dollar failed to give immediate notice to 7979 of the need for repairs.

Despite Dollar's failure to give immediate notice of the need for repairs directly to 7979, the evidence shows 7979 had actual notice of the need for repairs from PCA and from Scott Word before the problems with the expansion joints began to interfere with Dollar's operations. PCA and Word forwarded 7979 copies of the Moore Report and the Kirkconnell Estimate months before 7979 purchased the Garage, and the purchase was made expressly subject to the items in the Moore Report.[22] The jury could therefore conclude that 7979 was not damaged by Dollar's failure to give 7979 immediate notice of the need

for repairs because 7979 had received notice from another source.

Moreover, we conclude that the jury's failure to award 7979 damages is not inconsistent with its finding that Dollar failed to comply with the Lease for an additional reason. In the damage question at issue, the jury was asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate 7979 for its damages, if any, that resulted from Dollar's failure to comply?" The accompanying instructions defined the sum to be determined as "[r]easonable and necessary costs incurred by 7979 *to make repairs to the Parking Garage that were the obligation of Dollar under the Lease Agreement.*" (emphasis added). Notably, the jury was not asked to determine what payment would compensate 7979 for Dollar's delay in providing 7979 with notice of the need for repairs. The record reflects 7979 submitted no evidence it was harmed by Dollar's failure to provide additional notice prior to February 28, 2002.[23]

We overrule 7979's second issue, which essentially challenges the jury's verdict as inconsistent.[24]

### E. Proof of Actual Damages

■ Although the jury awarded Dollar $16,037.20 as "reasonable and necessary costs incurred by Dollar to make repairs to the Parking Garage that were the obligation of 7979 under the Lease," 7979 argues that these costs were not for "repairs," but for barricades and safety netting erected to prevent personal and

---

22. Although Laskey testified that Word assured him the repairs had been performed, Laskey's testimony was contradicted by Word. Moreover, Word is not Dollar's agent, but 7979's agent; therefore, his statements are not attributable to Dollar.

23. After receiving actual notice of the need for repairs directly from Dollar, 7979 waited

an additional thirteen months to complete the repairs.

24. 7979 argues in the alternative that the jury found Dollar failed to comply with the Lease because Dollar failed to perform the repairs. Because the jury's findings can be reconciled on the reasonable basis discussed above, we do not reach this argument.

property damage from the existing holes and falling concrete.[25] 7979 argues that because these costs did not "repair" the expansion joint, Dollar was not entitled to be reimbursed for them.[26]

This argument misreads the jury charge. The jury was asked to determine Dollar's costs "to make repairs," and not merely the costs for the repairs themselves. Moreover, the evidence includes engineering reports listing barricades and temporary supports such as safety netting among the measures necessary to make repairs. Accordingly, the jury's finding that Dollar incurred $16,037.20 "to make repairs" to the Garage is supported by the record, and is not contrary to the overwhelming weight of the evidence.

We overrule 7979's eighth issue.

## F. Attorneys' Fees

7979's tenth issue challenges the award of Dollar's attorneys' fees on the grounds that the fees are not segregated and are excessive. In supplemental briefing in support of its motion for rehearing, 7979 argues that the Texas Supreme Court's opinion in *Tony Gullo Motors I, L.P. v. Chapa* requires that we remand this matter for a redetermination of Dollar's recoverable attorneys' fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex.2006).

### 1. Segregation of Attorneys' Fees

Because a party seeking attorneys' fees must show that the fees were incurred in connection with a claim that allows their recovery, parties are ordinarily required to segregate fees incurred for such work from fees incurred in connection with claims for which no such recovery is allowed. *See id.* at 313–14 (eliminating the exception to the segregation requirement for fees incurred solely on a separate but intertwined claim). If any attorneys' fees relate solely to a claim for which such fees are unrecoverable, the claimant must segregate recoverable from unrecoverable fees. *Id.* at 313. But this standard does not require attorneys to "keep separate time records when they draft[ ] the fraud, contract, or DTPA paragraphs of [a] petition"; rather, the evidence of the amount of recoverable attorneys' fees is sufficiently segregated, if for example, the attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorneys' fees are nonrecoverable had not been asserted. *Id.* at 314.

Here, 7979 argues that Dollar was required to segregate attorneys' fees incurred in prosecuting its breach of contract claim from fees incurred (a) defending against 7979's counterclaims, and (b) prosecuting its claim for breach of the implied warranty of suitability. On this record, we disagree with 7979's first contention, but we agree that Dol-

25. 7979 contends that the jury arrived at this figure by adding the cost of the engineer's report delineating the work needed to the cost of safety netting and barricades erected around the damaged joints. 7979 does not contend that the engineer's report was not a repair cost.

26. In its counterclaim, 7979 asked the jury to reimburse 7979 for the costs of similar safety measures taken in the course of repair. In asking this court to reverse and render judgment, 7979 continues to argue that its own repair costs are conclusively shown on the record, and includes its costs for barricades, signs, traffic barriers, temporary support of work, and the protection of existing construction. Thus, both at trial and on appeal, 7979 has argued that costs incurred to secure the area under repair and protect the surrounding area are not "repair costs," but applies this argument only to expenses paid by Dollar. 7979 makes no attempt to reconcile these two apparently contradictory positions.

lar is not entitled to recover attorneys' fees incurred solely in connection with its claim for breach of the implied warranty of suitability.

### a. Fees Dollar Incurred in Defeating Counterclaims

 7979 contends that attorneys' fees incurred in defending against claims of fraud and breach of contract are not recoverable; thus, it argues, Dollar was required to segregate the attorneys' fees it incurred in prosecuting its claims from the fees incurred in defending against 7979's fraud and breach of contract counterclaims. This argument fails to give due consideration to the procedural posture of this case. By asserting these causes of action as counterclaims, 7979 not only sought to recover damages, but also to reduce or avoid liability for Dollar's contract claim. As the Texas Supreme Court stated in *Tony Gullo Motors*, "to prevail on a contract claim a party must overcome any and all affirmative defenses (such as limitations, *res judicata*, or prior material breach), and the opposing party who raises them should not be allowed to suggest to the jury that overcoming those defenses was unnecessary." *Id.* at 314. By the same token, when a defendant asserts a counterclaim that the plaintiff must overcome in order to fully recover on its con-

tract claim, the attorneys' fees necessary to defeat that counterclaim are likewise recoverable. *See Varner v. Cardenas*, 218 S.W.3d 68, 68–70, 50 Tex. Sup.Ct. J. 525, (Tex.2007) (per curiam). Thus, Dollar does not have to segregate these fees from the fees necessary to prosecute Dollar's breach of contract claim.

 Here, the claims and counterclaims depend upon many of the same essential facts, using the same documents and witnesses, and Dollar had to defeat 7979's claims "before it could recover." *See Tony Gullo Motors*, 212 S.W.3d at 314; *Varner*, 218 S.W.3d 68, at 68–70; *RepublicBank Dallas, N.A. v. Shook*, 653 S.W.2d 278, 282 (Tex.1983). Dollar and 7979 each asserted that the other breached the Lease by failing to pay for repairs to the expansion joints. Evidence and argument concerning the Lease, the need for repairs, the date on which each of the parties became aware of the need for repairs, and the date and cost of repairs are relevant both to Dollar's claims and 7979's counterclaims. 7979 asserted a counterclaim for fraud by nondisclosure,[27] alleging that Dollar committed this tort by failing to inform 7979 that the prior landlord was in default and by failing to attach the Moore Report to the estoppel certificate. 7979 additionally counterclaimed for fraud,[28] alleging that

---

**27.** Elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without that knowledge. *See Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex.2001); *Schlumberger Tech. Corp. v. Swanson*, 959

S.W.2d 171, 181 (Tex.1997); *Bright v. Addison*, 171 S.W.3d 588, 599 (Tex.App.-Dallas 2005, pet. dism'd).

**28.** The elements of fraud are: (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, the defendant knew the representation was false, or made the representation recklessly, without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury. *In re FirstMerit*

Dollar falsely represented there was no uncured default by the prior landlord. Dollar's defense to the counterclaims involves much of the same evidence and testimony relevant to Dollar's breach of contract claim. Evidence that (a) repairs became necessary, (b) 7979 was notified of the need for repairs,[29] (c) repairs are the landlord's responsibility, (d) 7979 failed to timely make required repairs, and (e) the default arose after 7979's assumption of the Lease, were essential both to Dollar's claims and to its defense against 7979's counterclaims.

With the exception of its experts on attorneys' fees and damages, all of Dollar's witnesses testified to one or more of these common facts. Susan Speaker of Dollar testified that problems from the expansion joints arose in November or December of 2001 and February of 2002; that Dollar notified 7979 of its default on June 25, 2002; and that the prior landlord was never in default. Eric Chaves of PCA testified that PCA received no default notices; that PCA was not in default prior to the sale; and that Dollar never lost the use of parking spaces during PCA's ownership. Scott Word, who acted as the real estate broker for both PCA and 7979 in this transaction, testified that he attended the site inspection with 7979's principal, and there was no falling cement and no parking spaces blocked off at that time. Jesse Alba, city manager for Dollar from July 20, 2001 to October 21, 2001, testified that there were no holes in the Garage or blocked parking spaces when he began managing the facility; that on October 21, 2001, there was one hole and about twenty spaces were blocked; that he obtained repair estimates on August 28 and 31, 2001; that Dollar's customers began to complain; and that Dollar subsequently had to reroute shuttles and could not use some areas of the Garage. Faisal Mustafa, city manager for Dollar from November 2001 to June 2004, authenticated photographs he had taken in May 2002 of holes in the driveway and in the second and third floors. He further testified regarding parking spaces that were blocked off, stating that the number of spaces affected increased in 2002. He also testified that Dollar was advised not to take shuttles on the second and third floors at all; that barricades had to be erected; that Dollar had to drop its parking rates; and that Dollar lost several monthly contract customers.

The documentary evidence necessary for Dollar's breach of contract claim also overlapped with the evidence necessary for the remaining claims and counterclaims. Interpretation of the Lease was required to determine whether and when a default arose, and that determination was essential to the contract, warranty, and fraud claims. Evidence of prior temporary repairs, paid for by PCA, provided extrinsic evidence of the landlord's contractual obligation, and was also relevant to Dollar's warranty claim.[30] The Moore Report was evidence of the need for repairs, and docu-

---

*Bank,* 52 S.W.3d 749, 758 (Tex.2001) (orig.proceeding).

**29.** The Lease provides that "[i]n the event that the Leased Premises should become in need of repairs required to be made by Lessor hereunder, Lessee shall give immediate written notice thereof to Lessor and Lessor shall not be responsible in any way for failure to make any such repairs until a reasonable time shall have elapsed after delivery of such written notice."

**30.** This evidence would allow Dollar to recover its proven damages if the trial court found the Lease unambiguously requires 7979 to pay for the repairs at issue. Dollar would prevail on the same evidence if the Lease was found to be ambiguous, and Dollar was forced to rely on extrinsic evidence to show that the landlord was required to make the repairs.

ments and testimony tracing the Moore Report's transmission from Dollar to PCA and Word and finally to 7979 and its appraiser are relevant to every claim and counterclaim in the case.

If believed, the evidence Dollar presented in prosecuting its breach of contract claim was also dispositive of its claim for breach of the implied warranty of suitability and 7979's counterclaims. Dollar's lead attorney testified that the prosecution of Dollar's claims was "so intertwined" with the defense of 7979's counterclaims that "you can't possibly split out what the services were for."

On the record before us, we conclude Dollar was not required to segregate the attorneys' fees it incurred to prosecute its breach of contract claim from the fees incurred to defeat 7979's counterclaims.

### b. Fees Dollar Incurred Solely to Prosecute Its Warranty Claim

 Even if the evidence presented pertains to all of the claims and counterclaims in the case, a litigant is not necessarily entitled to recover all of its legal fees. As the Texas Supreme Court has recently made clear, the determination focuses on whether the legal work performed pertains solely to claims for which

attorneys' fees are not recoverable. Moreover, in making this determination, factfinders do not examine the work product as a whole, but parse the work into component tasks. *See Tony Gullo*, 212 S.W.3d at 313 ("But when Chapa's attorneys were drafting her pleadings *or the jury charge relating to fraud*, there is no question [that] those fees were not recoverable.") (emphasis added); *id.* at 314 ("Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA *paragraphs of her petition*; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim.") (emphasis added). If any of the component tasks relate solely to a cause of action for which legal fees are not recoverable, the claimant must segregate the fees.

 That standard has not been satisfied in this case. For example, Dollar's petition contains a paragraph asserting its cause of action for breach of the implied warranty of suitability, and the jury charge contains two jury questions that pertain solely to this claim.[31] The attorneys' fees relating solely to the prosecution of those claims and hence, to drafting this language, are not recoverable. Al-

---

31. Dollar has sought to recover these fees only on the ground that the legal fees it incurred for all claims and counterclaims in the case are inextricably intertwined with its breach of contract claim. Dollar has never contended that attorneys' fees incurred solely to prosecute a claim for breach of the implied warranty of suitability are independently recoverable under section 38.001(8) of the Civil Practices and Remedies Code, nor do we find this to be the case. *See, e.g., Parkway Co. v. Woodruff*, 901 S.W.2d 434, 440 (Tex.1995) (noting that implied warranties are not statutory, but are judicially created); *Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991) (op. on reh'g) (noting that the UCC treats breach of contract and breach of warranty as different claims having different remedies); *Garcia v. Tex. Instruments, Inc.*, 610

S.W.2d 456, 463 (Tex.1980) (acknowledging previous statements by the Court when considering common-law remedies that "an implied warranty arising from sales sounds in tort and not in contract."); *Humber v. Morton*, 426 S.W.2d 554, 556 (Tex.1968) (suggesting that breach of the implied warranty of habitability, from which the warranty of suitability is derived, is an action in tort rather than in contract); *Harris Packaging Corp. v. Baker Concrete Constr. Co.*, 982 S.W.2d 62, 69 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (noting that provisions in the Texas Deceptive Trade Practices Act permitting recovery of attorneys' fees for implied warranty claims for actions brought under the statute would be meaningless if one could recover attorneys' fees in the absence of the statute); *Kerrville HRH, Inc. v. City of Kerrville*, 803

though the jury charge and the petition contain less than a dozen sentences related solely to this claim, "unrecoverable fees [are not] rendered recoverable merely because they are nominal...." *Tony Gullo Motors*, 212 S.W.3d at 313.

 The Court's conclusion in *Tony Gullo Motors* therefore applies to the present case: "[W]hen, as here, it cannot be denied that at least some of the attorney's fees are attributable only to claims for which fees are not recoverable, segregation of fees ought to be required and the jury ought to decide the rest." *Id.* at 314. But Dollar did not forfeit its right to recover attorneys' fees by failing to segregate them. *See id.* The evidence it presented regarding the total amount of attorneys' fees it incurred is some evidence of what the segregated amount should be. *See id.* We therefore sustain 7979's tenth issue in part, reverse that

portion of the judgment awarding attorneys' fees to Dollar, sever that portion of the judgment, and remand this issue for a new trial on attorneys' fees.

As a result of our disposition of this issue, we do not reach the question of whether the total attorneys' fee award is excessive.

## V. CONCLUSION

We reverse that portion of the judgment awarding attorneys' fees to Dollar, sever that portion of the judgment, and remand the issue to the trial court for a determination of Dollar's recoverable attorneys' fees in a manner consistent with this opinion. In all other respects, we affirm the judgment of the trial court.

S.W.2d 377, 385 (Tex.App.-San Antonio 1990, writ denied) (noting that breach of the implied warranty of suitability is a common-law cause of action, but addressing only the amount of attorneys' fees awarded and not the entitlement to attorneys' fees); *Momax, LLC v. Rockland Corp.*, 223 Fed.Appx. 334 (5th Cir.2007) (per curiam) (slip op.) (not designated for publication) (refusing to award attorneys' fees on claims of breach of unspecified implied warranties under Texas Civil Practice and Remedies Code § 38.001 because doing so would controvert "a substantial body of Texas caselaw").

We are mindful of the large body of caselaw stating that an implied warranty becomes part of the terms of a contract. *See, e.g., Parkway*, 901 S.W.2d at 439 (quoting ARTHUR BIDDLE, A TREATISE ON THE LAW OF WARRANTIES IN THE SALE OF CHATTELS 1 (Philadelphia, Kay & Brother 1884)); *Certain–Teed Prods. Corp. v. Bell*, 422 S.W.2d 719, 721 (Tex.1968) (stating that "a warranty which the law implies from the existence of a written contract is as much a part of the writing as the express terms of the contract"); *Lee v. Perez*, 120 S.W.3d 463, 468 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (stating that an implied warranty "is part of the contract itself."); *W. Tank & Steel*

*Corp. v. Gandy*, 385 S.W.2d 406, 409 (Tex.Civ. App.-Texarkana 1964, no writ) ("Warranty, either express or implied, must grow out of contractual relations between the parties."). Here, however, Dollar has never contended that the prosecution of its claim for breach of the implied warranty of suitability is a claim "for an oral or written contract" such that attorneys' fees are recoverable for legal fees incurred solely for its prosecution. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997); *see also Lee*, 120 S.W.3d at 468 n. 18 (upholding the award of attorneys' fees for breach of contract because the landlord breached the implied warranty of suitability and the terms of the lease defined a default by the landlord to include a breach of a warranty); *Altz v. Leiberson*, 134 N.E. 703 (N.Y.1922) (in perhaps the earliest case recognizing the implied warranty of habitability, J. Cardozo applied reasoning most closely akin to negligence or negligence per se, without distinguishing contract law); 2 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 16B.08[2][e] (Michael Allan Wolf, ed., 2005) (discussing the roots in negligence law of the tort claim of breach of the implied warranty of habitability, from which the implied warranty of suitability is derived).