ACCEPTED
03-15-00429-CV
8226550
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/14/2015 3:07:10 PM
JEFFREY D. KYLE
CLERK

NO. 03-15-00429-CV

_____

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/14/2015 3:07:10 PM
JEFFREY D. KYLE
Clerk

_____

DENNIS DRAPER, GREG HADLEY, and CHARLES HUSTON,

Appellants,

v.

AUSTIN MANUFACTURING SERVICES, I, INC.,

Appellee.

_____

**On Appeal from No. D-1-GN-09-004416**
**In the 353rd Judicial District Court, Travis County**
**Honorable Orlinda Naranjo, Presiding**

_____

**APPELLEE'S BRIEF ON THE MERITS**

_____

**DYKEMA COX SMITH**

Christopher D. Kratovil
State Bar No. 24027427
Email: ckratovil@dykema.com
1717 Main Street, Suite 4200
Dallas, Texas 75201
(214) 462-6400 – Telephone
(214) 462-6401 – Facsimile

**DYKEMA COX SMITH**

Kristina M. Williams
State Bar No. 24078303
Email: kwilliams@dykema.com
111 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 703-6300 – Telephone
(866) 793-5834 – Facsimile

**COUNSEL FOR APPELLEE**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Appellants—Defendants** | **Dennis Draper, Greg Hadley, Charles Huston** |
| Defendant's Trial Counsel | The O'Toole Law Firm, PC<br>Brian O'Toole<br>botoole@bottolepc.com<br>504 Lavaca, Suite 945<br>Austin, TX 78701<br>512-476-4740 – Telephone |
| Appellant's Appellate Counsel | Law Office of Michael S. Truesdale, PLLC<br>Michael S. Truesdale<br>mike@truesdalelaw.com<br>801 West Avenue, Suite 201<br>Austin, TX 78701<br>512-482-8671 – Telephone<br>866-847-8719 – Facsimile |
| **Appellee-Plaintiff** | **Austin Manufacturing Services I, Inc.** |
| Plaintiff's Trial Counsel | Dykema Cox Smith<br>Brian A. Colao<br>bcolao@dykema.com<br>J. Matthew Sikes<br>msikes@dykema.com<br>1717 Main Street, Suite 4200<br>Dallas, TX 75201<br>214-462-6400 – Telephone<br>214-462-6401 – Facsimile |
| Appellee's Appellate Counsel | Dykema Cox Smith<br>Christopher D. Kratovil<br>ckratovil@dykema.com<br>1717 Main Street, Suite 4200<br>Dallas, TX 75201<br>214-462-6400 – Telephone<br>214-462-6401 – Facsimile |

i

Dykema Cox Smith
Kristina M. Williams
Email: kwilliams@dykema.com
111 Congress Avenue, Suite 1800
Austin, TX 78701
(512) 703-6300 – Telephone
(866) 793-5834 – Facsimile

Other parties to the Trial Court's Final Judgment but not to the appeal include Darryl Cornish, Assistant Pro, Inc., and TQI Corporation. These parties did not appeal. These now-Judgment debtors were represented in the trial court by The Law Office of Shane M. Boasberg, Shane M. Boasberg (shaneb@law-smb.com), 2901 Bee Caves Road, Box E, 78746, 512-561-5003 (telephone), 512-561-5004 (fax).

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................ i

TABLE OF CONTENTS ............................................................................ iii

INDEX OF AUTHORITIES ......................................................................... v

STATEMENT REGARDING ORAL ARGUMENT ........................................... 1

STATEMENT OF THE CASE ...................................................................... 2

ISSUES PRESENTED ................................................................................ 3

FACTS AND PROCEDURAL HISTORY ....................................................... 4

    A.    Introduction and Overview ............................................................. 4

    B.    AMS and A-Pro/TQI contract for the production of Golf Guru units, backed by personal guarantees of Guarantors Draper, Cornish, Hadley, and Huston. ........................................................ 5

    C.    A-Pro's Order is modified to include color Golf Guru units, in addition to the original black and white units. ................................ 8

    D.    AMS fulfills its part of the bargain, but A-Pro/TQI and the Appellant Guarantors do not. ........................................................ 10

    E.    After multiple unsuccessful demands, AMS is left with no choice but to sue to enforce the contract. ................................................ 12

SUMMARY OF ARGUMENT ..................................................................... 16

ARGUMENT ........................................................................................... 18

    I.    Standard of Review: This Court Must Give Substantial Deference to the Trial Court's Findings of Fact, But May Review Its' Conclusions of Law *De Novo* ..................................................... 18

    II.    The Trial Court Correctly Found that Purchase Order 1682 and the Guarantees Were Executed Hand-In-Hand and as a Basis for AMS's Extension of Credit to A-Pro. ............................................. 19

III.    The Trial Court Correctly Held the Underlying Transaction—the Manufacture of Golf Guru Units by AMS for A-Pro, Based on an Underlying Contract and Guarantees by the Guarantors—Never Changed. ...................................................................................25

IV.    The Trial Court Correctly Held that A-Pro, as Purchaser, and Appellants, as Guarantors, have a Significant Outstanding Balance Due and Payable to AMS Under PO 1682 and the Guarantees. ..........33

V.    The Trial Court's Award of Attorneys' Fees to Plaintiff-Appellee was Reasonable, and Appellant Guarantors Show No Error on this Point. ...................................................................................40

CONCLUSION AND PRAYER ........................................................................44

CERTIFICATE OF COMPLIANCE .................................................................46

CERTIFICATE OF SERVICE .........................................................................47

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*,
245 S.W.3d 488 (Tex. App.—Houston [14th Dist.] 2007, pet.
denied)......................................................................................................43

*Am. Multi-Cinema, Inc. v. Hegar*,
No. 03-14-00397-CV, 2015 Tex. App. LEXIS 4388 (Tex. App.—
Austin April 30, 2015, no pet.) (mem. op.) ........................................18

*Anchia v. DaimlerChrysler AG*,
230 S.W.3d 493 (Tex. App.—Dallas 2007, pet. denied)................. 18-19, 20, 33

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
945 S.W.2d 812 (Tex. 1997) ........................................................40, 41

*Austin Hardwoods, Inc. v. Vanden Berghe*,
917 S.W.2d 320 (Tex. App.—El Paso 1995, writ denied) ....................24, 26, 32

*Beal Bank, SSB v. Biggers*,
227 S.W.3d 187 (Tex.App.—Houston [1st Dist.] 2007, no pet.).......................32

*BMC Software Belg., N.V. v. Marchand*,
83 S.W.3d 789 (Tex. 2002)..........................................................18

*Broesche v. Jacobson*,
218 S.W.3d 267 (Tex. App.—Houston [14th] 2007, pet. denied) ....................43

*Clearview Props., L.P. v. Property Tex. SC One Corp.*,
287 S.W.3d 132 (Tex. App.—Houston [14th Dist.] 2009, pet.
denied)......................................................................................................43

*Cox v. Lerman*,
949 S.W.2d 527 (Tex. App.-Houston [14th Dist.] 1997, no pet.) ......................37

*Elaazami v. Lawler Foods, Ltd.*,
No. 14-11-00120-CV, 2012 Tex. App. LEXIS 973 (Tex. App.—
Houston [14th Dist.] Feb. 7, 2012, no pet.) (mem. op.) ....................................31

*FDIC v. Attayi*,
745 S.W.2d 939 (Tex. App.—Houston [1st Dist.] 1988, no writ.) ....................23

*Fin. Fed. Credit, Inc. v. Bean*,
No. 07-cv-3503, 2009 U.S. Dist. LEXIS 126601 (S.D. Tex. Jan.
12, 2009) ........................................................................................................22

*Frost Nat'l Bank v. Burge*,
29 S.W.3D 580 (Tex. App.—Houston [14th Dist.] 2000, no pet.)...23, 26, 29, 30

*In the Interest of J.O.A.*,
283 S.W.3d 336 (Tex. 2009) ........................................................................20

*Jim Walter Homes, Inc. v. Schuenemann*,
668 S.W.2d 324 (Tex. 1984) ........................................................................23

*McKnight v. Virginia Mirror Co., Inc.*,
463 S.W.2d 428 (Tex. 1971) ........................................................................32

*Ortiz v. Jones*,
917 S.W.2d 770 (Tex. 1996) .............................................................18, 20, 33

*Pham v. Mongiello*,
58 S.W.3d 284 (Tex. App.—Austin 2001, pet. denied) ....................................37

*Rapid Settlements, Ltd. v. Settlement Funding, LLC*,
358 S.W.3d 777 (Tex. App.— Houston [14th Dist.] 2012, no pet.) ..................41

*Rep. Nat. Bank of Dallas v. Nw. Nat. Bank of Fort Worth*,
578 S.W.2d 109 (Tex. 1978) ........................................................................37

*Stewart Title Guar. Co. v. Aiello*,
941 S.W.2d 68 (Tex. 1997)...........................................................................42

*Terrell v. Williams*,
No. 013-13-00473-CV, 2015 Tex. App. LEXIS 5151 (Tex. App.—
Austin May 21, 2015, no pet.) (mem. op.) .......................................................18

*Tony Gullo Motors I, L.P. v. Chapa*,
212 S.W.3d 299 (Tex. 2006) .....................................................................41, 42

*Varner v. Cardenas*,
218 S.W.3d 68 (Tex. 2007)...........................................................................42

*Vastine v. Bank of Dallas*
    808 S.W.2d 463 (Tex. 1991) .............................................................29

**STATUTES**

Tex. Civ. Prac. & Rem. Code ch. 38 ...................................................40

**OTHER AUTHORITIES**

Christine Ammer, *The Facts on File Dictionary of Clichés* 111 (2001).................26

Anna Scotti & Paul Young, *Buzzwords* 59 (1997) ...................................26

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Tex. R. App. P. 39.7, Appellee Austin Manufacturing Services I, LLC ("Appellee" or "AMS") respectfully requests oral argument in this matter. Appellee submits that oral argument will materially assist this Court with resolution of this appeal because of the relative factual complexity of this case and the important but basic contractual principle it embodies: parties who order and receive custom goods from a manufacturer must pay for them.

# STATEMENT OF THE CASE

**Nature of the Case:**     This is a commercial breach of contract case resulting from buyer Assistant Pro, Inc. ("A-Pro") and guarantors Dennis Draper, Darryl Cornish, Greg Hadley, and Charles Huston's (collectively, "Guarantors") failure to pay for custom goods that they ordered, with such goods manufactured and delivered by seller Austin Manufacturing Services, L.P. ("AMS" or "Appellee"). After a bench trial, the Trial Court entered Final Judgment in favor of AMS and against A-Pro and the Guarantors for amounts due under PO 1682, the contract at issue.

**Trial Court:**     The 353rd Judicial District Court, Travis County, Texas, Cause No. D-1-GN-09-004416; the Honorable Orlinda Naranjo (the "Trial Court" or "Judge Naranjo"), presiding.

**Trial Court Disposition:**     Following a bench trial and the entry of Findings of Fact and Conclusions of Law and Additional Findings of Fact and Conclusions of Law, the Trial Court entered Final Judgment for Plaintiff-Appellee AMS and against Defendants A-Pro and the Guarantors. Several of the Guarantors subsequently brought this appeal, while A-Pro and Guarantor Daryl Cornish did not appeal.

2

# ISSUES PRESENTED

**I.**  **Whether this Court should defer to the Trial Court's Findings of Fact, made after the bench trial in this matter.**

**II.**  **Whether the Trial Court correctly found that Purchase Order 1682 and the Guarantees signed by the Appellant Guarantors were executed hand-in-hand and as a basis for AMS's extension of credit to A-Pro.**

**III.**  **Whether the Trial Court correctly held that the underlying transaction—the manufacture of Golf Guru units by Plaintiff-Appellee AMS for A-Pro, based on an underlying contract and Guarantees executed by the Appellant Guarantors—ever changed.**

**IV.**  **Whether the Trial Court correctly held that A-Pro, as purchaser, and Appellants, as Guarantors, have a significant outstanding balance due and payable to AMS under Purchase Order 1682 and the Guarantees.**

**V.**  **Whether the Trial Court's award of attorneys' fees to Plaintiff-Appellee AMS was reasonable.**

## FACTS AND PROCEDURAL HISTORY

### A.    Introduction and Overview

This is a simple breach of contract case.  A start-up company ordered custom-made goods from a manufacturer.  The order was personally guaranteed by the principals of the start-up company.  The custom goods were manufactured and delivered, but not paid for.  Litigation followed.  After a bench trial, the Trial Court entered judgment obligating the Guarantors, including these Appellants, to honor their guarantees and to pay for the goods their company ordered.  While the details and specifics will follow, this case is ultimately that simple.

Plaintiff-Appellee Austin Manufacturing Services, L.P.[1] ("AMS") is an Austin-based manufacturer of sophisticated electronic devices.[2]    AMS manufactured a number of "Golf Guru" GPS units designed and conceived of by A-Pro, a new company formed to capitalize on the benefits of GPS units on the golf course.  In order to obtain the credit necessary to retain AMS to manufacture the "Golf Guru" units for A-Pro, the four individual principals of A-Pro (Dennis

---

[1]Austin Manufacturing Services, L.P., a partnership, was a predecessor entity to Austin Manufacturing Services I, Inc.  1 C.R. 485.  AMS LP merged into Austin Manufacturing Services I., Inc.  *Id.*  Any and all obligations, debts, accounts receivables, contracts or other debts or instruments belonging to AMS LP or any other "Austin Manufacturing Services" entity now belong in their entirety to Austin Manufacturing Services I, Inc.  *Id.*  Austin Manufacturing Services I, Inc. was the Plaintiff in this case.  *Id.*

[2] AMS does *not* design or market devices of its own.  Instead, AMS manufacturers devices to the specifications of its customers, including A-Pro.  In this regard, AMS' services are like those of a short-order cook preparing a recipe; AMS does not supply the recipe itself, it merely cooks the meal that the customer orders.  The Golf Guru unit was A-Pro's design and product, and AMS merely manufactured what A-Pro ordered.

4

Draper, Darryl Cornish, Greg Hadley, and Charles Huston) ***personally guaranteed*** A-Pro's purchase order from AMS. Each Guarantor agreed to assume liability for 25% of the overall purchase order placed by A-Pro, expressly guaranteeing the payment for purchase of 5,000 Golf Guru units.

Despite selling all of the Golf Guru units AMS manufactured at its request, A-Pro ultimately defaulted on its obligations to AMS. AMS brought suit against A-Pro, A-Pro's sister company TQI, and the four individual Guarantors. Following a bench trial, Judge Naranjo entered Final Judgment against A-Pro, TQI, and all four of the individual Guarantors. Three of the individual Guarantors—but not A-Pro, TQI, or Guarantor Cornish—appealed the Trial Court's judgment, leading to the instant appeal.

### B. AMS and A-Pro/TQI contract for the production of Golf Guru units, backed by personal guarantees of Guarantors Draper, Cornish, Hadley, and Huston.

Plaintiff-Appellee AMS provides a broad range of manufacturing services, including power management systems, oil field instrumentation, and automotive, customer recreation, and mobile devices. 1 C.R. 7. AMS also manufactures, refurbishes, and repairs GPS navigation systems designed and developed by its clients. *Id.*

AMS began working with two affiliated companies, Assistant Pro, Inc. ("A-Pro") and TQI Corporation ("TQI"), which had developed GPS-enabled

5

applications for the North American golf industry market. 1 C.R. 8. TQI is a sister company of A-Pro and shared common management, including key employee and officer Richard Horne ("Horne"), common office space and various other resources, and were affiliated companies in all respects, acting as a joint unit. 1 C.R. 444; 2 R.R. 51-55. A-Pro and TQI sought to have AMS manufacture the "Golf Guru" GPS units they had developed. A-Pro's Golf Guru is a device that allows golf course operators to control course access, estimate distances to pins, and track golfers' statistics during play. 1 C.R. 8.

AMS was understandably hesitant to manufacture A-Pro's products without guarantees from A-Pro/TQI's principals. On October 9, 2007, after extensive discussion, A-Pro/TQI contracted with AMS to purchase 5,000 black and white Golf Guru units priced at $128.95 each, for resale by A-Pro. 1 C.R. 444-45, 2 R.R. 51-55; 3 R.R. 125-27. This contractual order was reflected and memorialized in Purchase Order 1682 ("PO 1682"), which, *inter alia*, confirmed A-Pro/TQI's assumption of responsibility for any and all materials and/or all units manufactured by AMS pursuant to that order. 1 C.R. 444. Foreshadowing later changes in response to market conditions, PO 1682 itself incorporated by reference terms and conditions anticipating change. 3 R.R 24-27; 6 R.R. 668. The parties understood PO 1682 to be a "blanket" purchase order subject to potential changes, as reflected both in the terms and conditions referenced in the quotation and in the parties

6

subsequent course of business. 3 R.R. 146 (trial examination of Guarantor Cornish) ("Q: And in this case, is it fair to say that Exhibit 1, Purchase Order 1682, is what's known as a blanket P.O.? A: Yes, that's correct."); 3 R.R. 86 (trial examination of A-Pro Officer Horne) ("Q: And you understood under that under these terms and conditions, it was possible for the customer in this, you know to change the recipe and just be responsible for the charges associates with changing the recipe? A: That's correct."); *see also* 6 R.R. 668 (quote preceding PO 1682).

Defendants-Appellants Dennis Draper ("Draper"), Greg Hadley ("Hadley"), Charles Huston ("Huston"), and Defendant (but non-Appellant) Darryl Cornish ("Cornish"), were the owners and principals of both A-Pro and TQI. 1 C.R. 5-7, 444. Huston was employed as President, with Draper, Cornish, and Hadley as Directors of both companies. 1 C.R. 5-7, 444. Draper, Cornish, Hadley, and Huston were all authorized to act on behalf of A-Pro and conducted business and operations on its behalf. *Id*.

Draper, Cornish, Hadley, and Huston each individually signed and personally and expressly guaranteed (individually, the "Guarantee" and collectively, the "Guarantees") 25% of PO 1682—the order of 5,000 black and white Golf Guru units at $128.95 per unit (the "Guaranteed Portion") from AMS. 1 C.R. 445. Each Guarantee expressly included twenty-five percent (25%) of PO 1682. *Id*. The Guarantors knew that their Guarantees were essential to AMS's

7

agreement to produce the Golf Guru units for the benefit of A-Pro. 2 R.R. 51-55. The Guarantors in fact all testified that A-Pro—not TQI—ultimately sold and paid for *some* of the 5,000 units it received, reducing the overall amount due from the Guarantors. 3 R.R. 188 (Cornish testimony); 3 R.R. 210 (Draper testimony); 4 R.R. 16 (Hadley testimony); 4 R.R. 88 (Huston testimony).

### C. A-Pro's Order is modified to include color Golf Guru units, in addition to the original black and white units.

The first tranche of Golf Guru units had black and white screens. However, A-Pro ultimately revised its sales strategy and decided to offer both color and black and white Golf Guru units. 3 R.R. 113-17 (stating the "market dictated" changes). Accordingly, A-Pro requested and AMS manufactured a number of color Golf Guru units as well, the price of which was slightly above the $128.95 per unit guaranteed by each Guarantor. Acting on behalf of all the Guarantors, Guarantor and A-Pro principal Cornish consented to and accepted changes to PO 1682 on behalf of TQI, A-Pro and the Appellants, including that AMS would produce color Golf Guru units for A-Pro/TQI. 1 C.R. 447. The record establishes that all of the Guarantors discussed and consented to these changes. *Id.* As a result, because Cornish individually guaranteed twenty-five percent (25%) of the total amount due and owed to AMS under PO 1682 by the terms of his Guarantee, the amount owed by Cornish under his individual Guaranty to AMS was $85,621.23, exclusive of attorneys' fees and interest. 1 C.R. 447-48.

8

Significantly, the additional price paid for color units did not impact the individual guarantees of the Appellant Guarantors, none of whom were ultimately found responsible for any additional cost due to the change to color screens.

The Trial Court concluded that Appellants Draper, Hadley, and Huston did not guarantee the purchase of any color (as distinct from black and white) Golf Guru units from AMS. 1 C.R. 448. The written terms of the Appellants' Guarantees never changed, and instead, remained the same at 5,000 black and white Golf Guru units, at $128.95 per unit ($70,408.47 for each Guarantor). 1 C.R. 447-48. However, any decisions made by Cornish or any additional orders or modifications of PO 1682 materially benefited both Cornish and his fellow Appellants, as A-Pro accepted and materially benefited from the sale of both color and black and white Golf Guru units. 1 C.R. 447. In other words, A-Pro's decision (made through Cornish) to have AMS manufacture color Gulf Guru units benefitted both A-Pro and its principals, the Guarantors.

The Guarantors and A-Pro quickly discovered that their product required tweaks, most notably in the form of revised maps and a change to color units to match the market. 3 R.R. 181-84. To accommodate these changes, they made a decision to do "take down" orders in increments of less than 5,000. *Id.* These took the form of several different purchase orders. 6 R.R. 48, 692, 813, 816, 832, 852, 1047. A-Pro/TQI, not AMS, prepared these purchase orders. 3 R.R. 181-85. The

9

first "take down" order was also numbered "PO 1682" and was for 1,000 color units rather than the 5,000 black and white units referenced in the Guarantee. *Id.* Significantly, this purchase order was prepared *after* the Guarantors signed their Guarantees, which referenced the PO 1682 incorporating the terms and conditions included in the quotation for 5,000 black and white units. *Id.*; 6 R.R. 26, 648-50, 668. This second "PO 1682" was thus not the PO 1682 referenced in the Guarantees; it was part of, but not the entirety, of the transaction guaranteed by the Guarantors.

### D. AMS fulfills its part of the bargain, but A-Pro/TQI and the Appellant Guarantors do not.

AMS manufactured the Golf Guru units for A-Pro/TQI. 1 C.R. 445. A-Pro/TQI took and accepted delivery from AMS of several thousand Golf Guru units manufactured, including models with both color screens and black and white screens. *Id*. In other words, AMS delivered all the Gulf Guru units and fully satisfied all of its obligations to A-Pro/TQI set forth in PO 1682, as even the Appellants have acknowledged. *Id*.

In turn, A-Pro/TQI sold the Golf Guru units manufactured and received from AMS and received payment from third parties for those units sold. *Id*. In other words, A-Pro/TQI did exactly what it set out to do; order and receive custom manufactured products from AMS in order to sell them to others. What A-Pro and its principals (including the Appellant Guarantors) failed to do, however, was to

10

pay for what they ordered and received from AMS, despite the clear terms of PO 1682. 1 C.R. 446. A-Pro did make partial payments to AMS for some of the Golf Guru units it received from AMS. 6 R.R. 909-10, 963-64.

A-Pro/TQI's outstanding balance due to AMS, excluding any interest and fees, for purchases under PO 1682 (and excluding all other amounts owed to AMS) is comprised of: (1) accounts receivable of $241,977.51; (2) work in progress of $51,873.06; (3) raw materials in the amount of $42,379.58; and (4) finished goods in the amount of $6,254.76. *Id.* Thus, the total amount due to AMS under PO 1682 (and excluding all other amounts owed to AMS by A-Pro/TQI) was $382,484.92. *Id.* This amount reflects all partial payments made to AMS by A-Pro/TQI, as well as any lawful offsets and credits, done either at the express authorization of one or more of A-Pro/TQI or the Guarantors or where no instruction was given, such offsets or credits were consistent with industry practice and with notification to and without objection from A-Pro/TQI and the Guarantors. *Id.*

The total amount due to AMS by A-Pro/TQI for black and white Golf Guru units, which were initially contemplated by PO 1682, can be easily segregated from color Golf Guru units produced by AMS for A-Pro/TQI. The total amount due to AMS for black and white Gulf Guru units (*i.e.*, excluding any color screen units) under PO 1682 was $300,892.08 after the application of all payments, lawful

11

offsets, and credits (excluding interest and fees); the remaining amount due and owing is attributable to color Golf Guru units.[3] 1 C.R. 446-47.

These amounts due were not unknown or a surprise to A-Pro/TQI. Guarantor Cornish, an officer and owner of both A-Pro and TQI, specifically admitted that A-Pro/TQI is liable to AMS in the amount of $382,484.92. 1 C.R. 447. Moreover, Cornish unequivocally approved and consented to individually and personally guarantee the purchase of both color and black and white Golf Guru units from AMS by A-Pro under PO 1682. *Id.*

In sum, while AMS fully performed its obligations under PO 1682, A-Pro/TQI refused to pay AMS for the Golf Guru units and delivered under PO 1682. 1 C.R. 448. The Guarantors also failed to pay AMS the amounts they guaranteed and that A-Pro/TQI failed to pay to AMS under PO 1682. 1 C.R. 449. AMS made multiple demands for payment to both A-Pro/TQI and the Appellants, with no success. *Id.*

### E. After multiple unsuccessful demands, AMS is left with no choice but to sue to enforce the contract.

AMS brought suit against A-Pro/TQI and the Appellant Guarantors in state district court in Travis County, Texas, to enforce PO 1682 and the Guarantees. 1 C.R. 4, 9-10. AMS also raised claims for suit on a sworn account and quantum

---

[3] The black and white Golf Guru units balance is comprised of the following amounts: (1) $230,432.62 in receivables; (2) $21,825.12 for work in progress; (3) $42,379.58 in raw materials; and (4) $6,254.76 in finished goods. 1 C.R. 447.

meruit as to A-Pro/TQI and as well as for attorneys' fees against all defendants. 1 C.R. 11-13. Defendants answered, raising several affirmative defenses and cross-claims. 1 C.R. 15-69. The Parties tried the case in a bench trial before the Honorable Judge Orlinda J. Naranjo, and the Court ruled for Plaintiff AMS as to each Defendant. 1 C.R. 71. Plaintiff AMS filed a Motion for Entry of Final Judgment, which the Trial Court granted. 1 C.R. 70-417. The Trial Court entered Final Judgment in favor of Plaintiff AMS and against Defendants A-Pro, TQI, Cornish, Draper, Hadley, and Huston on AMS's breach of contract claim in April 2015. 1 C.R. 435-39.

The Trial Court awarded final judgment to AMS against TQI and A-Pro, jointly and severally, in the amount of $382,484.92 for goods and services provided by AMS, plus pre- and post-judgment interest until Final Judgment is entered. 1 C.R. 436. Plaintiff AMS was also awarded final judgment against Defendants TQI and A-Pro, jointly and severally with all Defendants, for attorneys' fees and costs, in the amount of $150,000.00 through submission of judgment. 1 C.R. 436-39. The Court also awarded conditional fees of $25,000 if the matter is appealed to the Austin Court of Appeals, and another $20,000 of conditional fees if further appeal is taken to the Texas Supreme Court. 1 C.R. 437.

The Trial Court also ruled in favor of Plaintiff AMS on its claims for breach of guaranty against Defendant Cornish, and awarded final judgment against

13

Cornish for goods and services guaranteed in the amount of $85,621.23, plus pre- and post-judgment interest. 1 C.R. 437. The Trial Court also ruled in favor of Plaintiff AMS against each of Defendants Draper, Hadley, and Huston, and awarded final judgment against each of Draper, Hadley and Huston, for goods and services guaranteed in the individual amounts of $70,408.47, plus pre- and post-judgment interest. 1 C.R. 437-38.

Defendant Appellants requested Findings of Fact and Conclusions of Law. 1 C.R. 440-42. The Trial Court entered Findings of Fact and Conclusions of Law on May 21, 2015. 1 C.R. 443-53. These findings included, *inter alia*, that AMS fully performed all of its obligations to A-Pro, TQI, and the Guarantors and A-Pro/TQI failed to perform their obligations to AMS by failing to remit payment in full for all the Golf Guru units manufactured and delivered by AMS. 1 C.R. 449-50. Defendant Appellants and Plaintiff AMS both requested additional/amended findings of fact and conclusions of law. 1 C.R. 454-63, 474-83. Plaintiff AMS filed a Motion to Enter Judgment Nunc Pro Tunc to correct minor errors in the judgment. 1 C.R. 464-73. The Trial Court entered Additional Findings of Fact and Conclusions of Law in June 2015, which, *inter alia*, found that any and all debts and obligations belonging to any "Austin Manufacturing Services" entity now belong in their entirety to Austin Manufacturing Services I, Inc., including

14

those at issue in this case.  1 C.R. 484-85.  In July 2015, the Trial Court entered Final Judgment for Plaintiff AMS.  1 C.R. 492-97.

Defendants and Guarantors Draper, Hadley, and Huston timely appealed. 1 C.R. 505-06.  Defendants A-Pro, TQI, and Guarantor Cornish have not appealed.

## SUMMARY OF ARGUMENT

A-Pro and its principals, including the Appellant Guarantors, ordered and received hundreds of thousands of dollars-worth of custom manufactured goods from AMS, but then failed to pay for them. Like diners who order and eat an expensive meal but then dash for the door of the restaurant before the check comes, A-Pro and the Appellant Guarantors are trying to unjustly escape their lawful payment obligations. At trial, the Appellant Guarantors attempted a transparent but hyper-technical corporate shell game in an effort to escape their Guarantees and the payment obligations that go with them. The Trial Court was correctly unpersuaded, and held that A-Pro and the Appellant Guarantors must finally pay for the gourmet meal that they ordered and that AMS delivered to their table. This Court should affirm the Trial Court's Final Judgment that holds the Appellant Guarantors accountable for their wrongful effort to "dine and dash."

Despite the shell game attempted by the Appellant Guarantors, this is ultimately a simple breach of contract case arising out of a routine business arrangement. AMS agreed to manufacture a product for A-Pro, in return for A-Pro's promise to pay, backed by the personal guarantees of officers/principals of A-Pro. AMS delivered the units, and A-Pro sold and profited from the units. As in almost any manufacturing arrangement, several orders and invoices were exchanged between A-Pro and AMS, resulting in an accounting ledger used to

16

"paper" the ongoing business relationship.  The business relationship between A-Pro and AMS hummed along, without any objection from the officers/principals of A-Pro, who were also the individual guarantors of the deal.

A-Pro ultimately failed to pay for the units it ordered and received, and AMS was forced to sue.  AMS prevailed in that lawsuit, and neither A-Pro nor TQI nor one of the individual Guarantors, Cornish, challenges that outcome on appeal. The Appellant Guarantors do not deny that AMS manufactured and delivered the Gulf Guru units that their company, A-Pro, ordered.  Instead, the Guarantors' only arguments on appeal are a litany of alleged hyper-technical defects in the guarantees combined with a misreading of the accounting ledgers documenting the transaction between AMS and A-Pro.  The Trial Court aptly rejected these meritless arguments of Appellant Guarantors, and this Court should do the same.

**ARGUMENT**

**I.     Standard of Review: This Court Must Give Substantial Deference to the Trial Court's Findings of Fact, But May Review Its' Conclusions of Law *De Novo*.**

It is well established under Texas law that a trial court's conclusions of law are reviewed on appeal *de novo* and its findings of fact must be given the same weight as a jury's verdict, and are rarely disturbed.

A trial court's conclusions of law are reviewed *de novo* to determine whether they are legally correct and should be upheld if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Am. Multi-Cinema, Inc. v. Hegar*, No. 03-14-00397-CV, 2015 Tex. App. LEXIS 4388, *8 (Tex. App.—Austin April 30, 2015, no pet.) (mem. op.) ("[W]e will not reverse an erroneous conclusion if the trial court rendered the proper judgment."). In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and this Court is to review the legal and factual sufficiency of the evidence to support them as it would review a jury's findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Terrell v. Williams*, No. 013-13-00473-CV, 2015 Tex. App. LEXIS 5151, *5 (Tex. App.—Austin May 21, 2015, no pet.) (mem. op.). A legal sufficiency challenge fails if there is ***more than a scintilla*** of evidence to support the trial court's finding. *Anchia v.*

*DaimlerChrysler AG*, 230 S.W.3d 493, 497 (Tex. App.—Dallas 2007, pet. denied)

Here, there is far more than a mere scintilla of evidence in the record to support the Trial Court's Findings of Fact, and Appellant Guarantors point to no viable error of law in the Trial Court's Conclusions of Law, as shown *infra*. Accordingly, this Court should affirm the Trial Court's Judgment for Appellee AMS.

## II. The Trial Court Correctly Found that Purchase Order 1682 and the Guarantees Were Executed Hand-In-Hand and as a Basis for AMS's Extension of Credit to A-Pro.

The Trial Court correctly found that all parties to the transaction—AMS, A-Pro, and the Guarantors—agreed to the fundamental nature of and terms to the agreement. 1 C.R. 445. PO 1682 would not have been entered into between AMS and A-Pro but for the Guarantees of the Guarantors, including the Appellants. 1 C.R. 142. Stated simply, AMS would not have extended credit to A-Pro, a start-up corporation with no payment history of its own, without the personal guarantees offered by A-Pro's individual owners, officers and directors, including the Appellant Guarantors. Moreover, not only were the Guarantors—who were, again, the officers and directors of A-Pro—aware of the basis and terms of the business deal with AMS, but the Guarantees themselves were tied to PO 1682 on the face of the Guarantees. 1 C.R. 194 (Huston Guarantee), 1 C.R. 196 (Draper Guarantee), 1 C.R. 198 (Hadley Guarantee); *see* 5 R.R. 19-22. In the face of this clear record

19

evidence, the Guarantors cannot retroactively repudiate their Guarantees based on supposed defects in form.

As a preliminary matter, Appellant Guarantors' direct attempt to challenge the Trial Court's findings of fact as to the plain language of the Guarantees expressly referencing PO 1682 fails because it is the finder of fact—here, the Trial Court—that is the ultimate factfinder, not this Court of Appeals. *See, e.g., Ortiz*, 917 S.W.2d at 772; *Anchia*, 230 S.W.3d at 497. Likewise, "the factfinder, not the appellate court, is the sole arbiter of the witnesses' credibility and demeanor[.]" *In the Interest of J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Having observed the witnesses and evaluated their credibility, the Trial Court correctly determined the parameters of this transaction to be 5,000 black and white units at $128.95 per unit. 1 C.R. 443-53. The record contains "more than a scintilla" of evidence to support the Trial Court's finding that PO 1682 is expressly referenced in the Guarantees, as well as the specific units manufactured and delivered to A-Pro, pursuant to the Guarantees. *See, e.g.,* 1 C.R. 194 ("I, Chad Huston . . . for and in consideration of your extending credit at my request to Assistant Pro, Inc., . . . personally guarantee to you the payment of twenty-five percent (25%) all amounts due to Austin Manufacturing Services . . . under Purchase Order 1682 for the purchase of 5000 Golf Guru units . . ."). Even if Appellant Guarantors' are correct that their individual Guarantees contained technical defects—which AMS does not

20

concede—any such defects cannot overcome that the Guarantors entered into Guarantees which expressly referenced PO 1682, which is the ultimate basis of the Final Judgment in favor of AMS and against A-Pro and the Guarantors. 1 C.R. 443-53.

Moreover, the parties contemplated precisely the transaction which occurred, as evidenced by the Guarantees themselves. 1 C.R. 194, 196, 198. This included contemplating change to the original purchase order; PO 1682 directly references a quotation (and is in fact based on that same quotation) containing terms and conditions anticipating future change. 3 R.R. 19-26. AMS prudently required execution of the Guarantees by the Guarantors before PO 1682 with A-Pro was fulfilled; without the Guarantees by the Guarantors, the underlying transaction between AMS and A-Pro, a company with no payment history on which to award credit, would have never occurred. 1 C.R. 142-43.

AMS manufactured and delivered the Golf Guru units to A-Pro, pursuant to PO 1682, fulfilling the business deal made contingent on the Guarantors Guarantees. 1 C.R. 144, 445. However, AMS was not paid by A-Pro for these Golf Guru units—a fact that triggered the payment obligations voluntarily assumed by A-Pro's owners, officers and directors, the Guarantors. 1 C.R. 150, 446. Stated another way, because the plain terms of the Guarantees ensured payment to AMS by the Guarantors in the event A-Pro did not pay for the goods it ordered and

received, the exact scenario the Guarantees were designed to protect AMS against actually occurred, and liability for A-Pro's undisputed non-payment thus fell to the Guarantors. *See, e.g.,* 1 C.R. 194 ("I hereby agree to pay such Guaranteed Portion punctually if default in payment thereof is made by the Purchaser."); 3 R.R. 19-26. The Trial Court correctly made such findings, based on far more than a "scintilla of evidence" in the record, and Appellant Guarantors make no showing on appeal that these findings were in error.

On appeal, the Appellant Guarantors rely exclusively on a dogmatic and myopic "strict construction" argument, and refuse to recognize the totality of the transaction between AMS and A-Pro or the full record. It is certainly true that "[i]f the creditor and principal debtor vary in any *material* degree from the terms of their contract, a new contract has been formed, and the guarantor is not bound by it." *Fin. Fed. Credit, Inc. v. Bean*, No. 07-cv-3503, 2009 U.S. Dist. LEXIS 126601, *10 n.1 (S.D. Tex. Jan. 12, 2009) (citing, *e.g.*, *McKnight v. Virginia Mirror Co., Inc.*, 463 S.W.2d 428, 430 (Tex. 1971)). However, discussed in detail *infra*, any changes to PO 1682 were not only contemplated by the parties at execution of the agreements and consented to when they arose, but certainly do not rise to the level of qualifying as "material."

Further, "before the rule of strict construction, or '*strictissimi juris*,' applies [to guarantees], we must determine the rights of the Appellants from the language

22

of the contract." *FDIC v. Attayi*, 745 S.W.2d 939, 943–44 (Tex. App.—Houston [1st Dist.] 1988, no writ.). The question for this Court is what the parties agreed to when they entered into the transaction. *Id.* at 945. Courts do not construe guarantees in isolation from the underlying transaction of which they were a part or construe them separately. *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Instead, Texas law follows the "well established principle that, in order to ascertain the entire agreement between the contracting parties, separate documents executed at the same time, for the same purpose, and in the course of the same transaction, are to be construed together." *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984). Documents executed contemporaneously are construed as one "to ascertain the intent of the parties." *Id.*

As discussed *supra*, the fundamental transaction intended by AMS, A-Pro, and the Guarantors (the officers, directors and owners of A-Pro) when PO 1682 and the Guarantees were executed was that AMS would manufacture Golf Guru units, A-Pro would receive and sell those Golf Guru Units, A-Pro would pay AMS a cost per Golf Guru unit, and the Guarantors would guarantee payment. Absent the Guarantees, AMS would not have entered into the transaction with A-Pro, a new and unproven company that could not qualify for credit absent guarantees from its principals. Beyond these fundamental terms, all the parties understood

23

that changes might be made. This is consistent with the quote A-Pro received referenced in PO 1682, and supported by testimony at trial. 3 R.R. 19-26 (trial testimony of Horne); 6 R.R. 668 (initial quote).

In affirming the Trial Court's Judgment, this Court should look to the El Paso Court of Appeals' opinion in *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320 (Tex. App.—El Paso 1995, writ denied). In *Austin Hardwoods*, a corporate officer provided a guaranty and the Court found no material alteration when the officer guaranteed the debts of the corporation "whereby the amount of credit and exact time of payment were to be determined in the future," as the officer entered into the transaction aware of potential changes to the initial debt guaranteed and was subsequently aware of changes to the debt. *Id*. at 326. The officer's guarantee was not excused. *Id*.

Just so here. Although the Appellant Guarantors may not like the outcome, there can be no doubt that PO 1682 and the Guarantees were executed hand-in-hand to provide for the very situation that occurred, such that AMS was guaranteed payment for the production of 5,000 Golf Guru units, whether that payment came from A-Pro or its officers/directors, the Guarantors, including the Appellants. The Trial Court did not err in making such findings, and Appellant Guarantors have not shown that the Trial Court's legal conclusions on this issue were in error.

**III. The Trial Court Correctly Held the Underlying Transaction—the Manufacture of Golf Guru Units by AMS for A-Pro, Based on an Underlying Contract and Guarantees by the Guarantors—Never Changed.**

Appellant Guarantors inappropriately characterize the decision to manufacture color instead of black and white Golf Guru units as a "material alteration" of the contract, as opposed to a modest change in product specifications based on market conditions which did not fundamentally changed the terms of the contract between AMS and A-Pro. Despite accepting the benefit of the bargain— taking possession of, selling, and profiting from the Golf Guru units, including color units, manufactured for them by AMS pursuant to PO 1682—the Appellant Guarantors seek to void their obligations for guaranteeing payment with dogmatic calls to strict construction. Perhaps most tellingly, the judgment against the Appellant Guarantors *excludes* any additional costs incurred as a result of any such changes. 1 C.R. 437-38. The Appellant Guarantors are attempting to void their liability on the basis of changes for which they are not even being held liable.

Even if the principles of contract law espoused by Appellant Guarantors are correct, and AMS contends they are not, accepting Appellants' contentions would constitute an affront to principles of equity. To borrow the old colloquial phrase,

Appellants are asking this Court to let them keep their cake, and eat it too.[4]  Or, to use a more contemporary analogy, the Appellant Guarantors are attempting to "dine and dash" by ordering and eating a meal at a restaurant only to flee without paying for it.[5]  Equity forbids "dining and dashing" and it equally forbids these Appellants from accepting and selling products from AMS, only to then refuse to pay for them.

## A.     No material changes were made to the Guarantees.

Under Texas law, a "material alteration" is a change which substantially or fundamentally  alters the legal obligations imposed on the parties from those they initially agreed to.  *See Austin Hardwoods*, 917 S.W.2d at 326.  The affirmative defense of material alteration requires proof of: (1) the existence of a material alteration to the underlying contract; (2) lack of consent to the alteration; and (3) harm resulting from the alteration.  *Id*.  "The test of whether an alteration is material is 'whether the altered writing describes the contract entered into by the parties, or whether the instrument's legal effect has been varied.'"  *Frost Nat'l Bank*, 29 S.W.3d at 588.

---

[4] The common phrase is: "eat one's cake and have it too."  The phrase is used to express the impossibility of having something both ways, if those ways conflict.  Christine Ammer, *The Facts on File Dictionary of Clichés* 111 (2001).

[5] The common phrase is "dine and dash."  The phrase means "to leave a restaurant without paying your bill."  Anna Scotti & Paul Young, *Buzzwords* 59 (1997).

As to the first element, the Guarantors do not cite to (and, more importantly, cannot cite to) any evidence in the record suggesting that their underlying obligation to guarantee payment for the 5,000 Golf Guru units at $128.95 per unit ever changed. Instead, they contend they should be relieved entirely from liability based largely upon Horne's testimony that changes (consented to by Appellants' fellow Guarantor Cornish) were made to PO 1682 to permit color units and that PO 1682 itself was parceled out over several deliveries and individual orders. Appellant's Brief at 23-25. Before this Court, and in contrast to their argument in the Trial Court, Appellant Guarantors place tremendous emphasis on a new and minor change—the delivery date of the units. However, the record is clear that the delivery date was merely "expected" rather than required, was not mentioned in the Guarantees, and was therefore not "material." 4 R.R. 109.

The question is not ***when*** the transaction occurred but whether the transaction ever became anything other than the one guaranteed by the Appellant Guarantors. Indeed, PO 1682 itself referenced the initial quotation provided to the Guarantors that included terms and conditions anticipating change; the Guarantors effectively guaranteed the possibility of changes in the underlying contract. 3 R.R. 19-26 (trial testimony of Horne); 6 R.R. 668 (initial quote).

More importantly, A-Pro (and TQI) employee Horne's trial testimony makes clear that the "take-down" orders and all orders filled by AMS for A-Pro, including

any deliveries at any time, were all made under Purchase Order 1682 and were part of and/or were included in the 5,000 unit order placed by Appellants. Simply put, these were changes to A-Pro's recipe, dictated by A-Pro to AMS in AMS' capacity as the "cook" for A-Pro's Golf Guru units. These changes never altered A-Pro and the Guarantors' promise to pay for whatever they ordered. *Id.*; 3 R.R. 86 (testimony of Horne) ("Q: And you understood that under these terms and conditions, it was possible for the customer in this, you know to change the recipe and just be responsible for the charges associated with changing the recipe? A: That's correct."). Cornish agreed in his trial testimony. 3 R.R. 110-11, 118, 146-48.

Yet again, Appellants seek to inject a hyper-technicality to avoid paying for the purchase of Gulf Guru units that they personally guaranteed. This argument fails both under the facts of the case and the law. To induce AMS to produce these units (or indeed to produce any units given the need for their guarantees to establish credit for A-Pro), Appellant Guarantors provided a guarantee of the transaction. 1 C.R. 194, 196, 198. The quantity (*i.e.*, the number of units) they guaranteed is identical in PO 1682, their individual Guarantees, and in the amount stated in the Trial Court's Final Judgment. 1 C.R. 492-504. Units valued at or above that price were manufactured by AMS, pursuant to PO 1682 and the Guarantees, and were delivered to and sold by A-Pro. *See* Horne, 3 R.R. 67 ("Q:

28

Would you expect the guarantor's maximum liability to be $646,750? A: I would expect the guarantor's liability to be the 5,000 units, whatever that came to within the quote."); *see also* 3 R.R. 111, 118, 212 (trial testimony of Cornish). The Trial Court found the Appellants individually and personally liable for precisely twenty-five percent (25%) of the guaranteed sum in accordance with their Guarantees. 1 C.R. 447-48. Accordingly, no material alteration of their underlying guarantee occurred. *Frost Nat'l Bank*, 29 S.W.3d at 588 ("The test of whether an alteration is material is 'whether the altered writing describes the contract entered into by the parties, or whether the instrument's legal effect has been varied.'") (citing *Spin-Line v. United Concrete Pipe Corp.*, 420 S.W.2d 744, 751-52 (Tex. Civ. App.—Dallas 1967), *aff'd in part, rev'd in part*, 430 S.W.2d 360 (Tex. 1968)). Appellants' argument, when taken to its logical conclusion, contemplates an absurd reality by which any change, however trivial or insignificant, would invalidate any guaranty. This cannot be the law, and the Trial Court correctly rejected the Guarantors' technicality-based argument.

Moreover, Appellants' reliance on *Vastine v. Bank of Dallas* is misplaced. 808 S.W.2d 463 (Tex. 1991) (per curiam). It contrast to *Vastine*, this is not an appeal from summary judgment. In *Vastine*, the Texas Supreme Court held in a *per curiam* opinion that because the guarantor in question had supplied some evidence of material alteration, a question of material fact existed to survive

summary judgment. *Id*. at 465. Here, the Trial Court, acting as finder of fact, considered and correctly rejected this argument at length after extensive post-trial briefing on the issue and a careful consideration of the evidence.

For these reasons, Appellants have not and cannot prove that a material alteration of their Guarantees occurred so as to void their obligations to AMS.

**B.     The Guarantors consented to all modifications to PO 1682.**

Moreover, to the extent Appellant Guarantors argue that *any* changes to delivery, price or composition of the product nullified their liability, they again swing and miss. Under Texas law, no material alteration occurs where a change is *consented* to. *See Frost Nat'l Bank*, 29 S.W.3d at 588. Testimony at trial made clear—and Appellants do not dispute—that they empowered their fellow Guarantor and business partner, non-Appellant Cornish as their agent who was acting on their behalf. Critically, Cornish *consented* to the very changes Appellant Guarantors now complain of. 3 R.R. 108 (confirming authority to act for A-Pro/TQI); 3 R.R. 115 (change to color units agreed to by all Guarantors); 3 R.R. 148 (board decision on take-downs because of market conditions); 3 R.R. 159-60 (change in take-down orders to A-Pro from TQI); 3 R.R. 166-68 (discussing changes to technical specifications, price, delivery date).

Despite the Guarantors' insistence that any change, however minor, somehow invalidates the guarantees, Cornish, their business partner and fellow

Guarantor and agent, ***agreed and consented*** to various changes to A-Pro's order. *Id.* AMS simply complied with A-Pro's requests. *Id.* These changes included those made to the name of the entity in the purchase order, the number of units requested, and the price per unit. *Id.* Further, Cornish consented to and anticipated numerous product changes, including engineering changes, color instead of greyscale, delivery date changes, changes to the number of units "taken down" at a time, and many others. *Id.* Cornish's testimony confirms his consent and provides a clear basis in the record for the Trial Court's holding. *Id.*

As principal of A-Pro, Cornish indisputably had authority to make and consent to these changes. *See, e.g., Elaazami v. Lawler Foods, Ltd.*, No. 14-11-00120-CV, 2012 Tex. App. LEXIS 973, *13 (Tex. App.—Houston [14th Dist.] Feb. 7, 2012, no pet.) (mem. op.) ("Texas law recognizes that a company's placement of an officer or employee in a certain position will provide the agent with apparent authority to bind the company in usual, customary, or ordinary contracts that a reasonable person would view as being consistent with an agent's scope of authority in that position."). In fact, Cornish informed the other Guarantors of his actions on behalf of A-Pro, and the other Guarantors did not object to or refute his actions. 3 R.R. 109, 117-18, 150, 182. Most importantly, PO 1682 itself incorporated by reference terms and conditions anticipating change. 3 R.R. 19-26. Indeed, testimony at trial made explicit the parties always

31

anticipated that any changes to the contract would be encompassed by the Guarantees. 3 R.R. 146 (trial examination of Guarantor Cornish) ("Q: And in this case, is it fair to say that Exhibit 1, Purchase Order 1682, is what's known as a blanket P.O.? A: Yes, that's correct."); 3 R.R. 86 (trial examination of A-Pro Officer Horne) ; *see also* 6 R.R. 668 (quote preceding PO 1682). The Trial Court correctly made such findings of fact and did not err in its accompanying conclusions of law. 1 C.R. 447-48.

## C. All modifications to PO 1682 benefitted the Guarantors.

Even assuming, *arguendo*, that the underlying agreement between A-Pro, the Guarantors, and AMS changed and rose to the level of a *material* alteration that was not *consented* to, Appellant Guarantors still cannot establish the legal defense of material alteration because they have yet to identify any harm to them from any alleged material alteration other than a pure hypothetical—that they would have sold all the units if delivered in November. Texas law is clear that the material alteration defense requires a showing of actual harm, not of merely hypothetical harm. *See Beal Bank, SSB v. Biggers*, 227 S.W.3d 187, 192 (Tex.App.—Houston [1st Dist.] 2007, no pet.); *Austin Hardwoods*, 917 S.W.2d at 326; *see also McKnight v. Va. Mirror Co.*, 463 S.W.2d 428, 430 (Tex. 1971).

The record is clear, and the Trial Court correctly found, that all the consented to "changes" to the original order materially *benefitted* the Guarantors

32

because A-Pro ultimately sold all the Golf Guru units in its possession. 1 C.R. 447. The Trial Court correctly concluded, as a matter of law, that without a showing of harm, the Guarantors' attempt to invoke the defense of material alteration must fail. 1 C.R. 451.

**IV.** **The Trial Court Correctly Held that A-Pro, as Purchaser, and Appellants, as Guarantors, have a Significant Outstanding Balance Due and Payable to AMS Under PO 1682 and the Guarantees.**

Continuing their pattern of misconstruing the underlying transaction at issue, the Appellants next argue that A-Pro's balance under PO 1682 is fully satisfied and therefore their Guarantees extinguished. Appellants' Brief at 25-32. A-Pro did satisfy *some portion* of its balance due to AMS. However, the balance under PO 1682 remains far from satisfied. Indeed, the Trial Court aptly found and the record confirms that the sum of payments by A-Pro to AMS has fallen far short of the $645,750.00 due under PO 1682. 1 C.R. 89 (Trial Court Letter Ruling), 110 (Accounting), 446 (Trial Court Findings of Fact & Conclusions of Law).

**A.** **A-Pro's Balance Under PO 1682 is Plainly Unsatisfied.**

Again, as an initial matter, Appellant Guarantors' attempt to challenge the Trial Court's findings of fact as to the balance due from A-Pro to AMS under PO 1682 must fail because it is the finder of fact—here, the Trial Court—that is the ultimate factfinder, not this Court of Appeals. *See, e.g., Ortiz*, 917 S.W.2d at 772; *Anchia*, 230 S.W.3d at 497. The record contains far more than a scintilla of

33

evidence to support the Trial Court's finding of the amount of A-Pro's balance to AMS that remains outstanding for black and white GPS Golf Guru units at a unit price of $128.95, is $281,633.89, as shown *infra*. Indeed, the Guarantors were well aware that PO 1682 was *never* paid in full, as Defendant and Guarantor Cornish testified. 3 R.R. 192 ("Q: Has it ever in the history of all of your dealings with AMS and this dispute, has it ever one time been your understanding that P.O. 1682 was fully paid? A: No.").

In sum, relying both on Cornish's admission and testimony from AMS personnel, the Trial Court correctly recognized that A-Pro failed to pay AMS the full $645,750.00 contemplated under PO 1682, much less the sums due to AMS for the manufacture of color Golf Guru units (the additional cost of which is expressly excluded from the Judgment against the Appellant Guarantors and therefore irrelevant to Appellants' appeal). 1 C.R. 107 (PO 1682), 110 (Accounting), 446 (Findings of Fact). As the record demonstrates, A-Pro has an outstanding total balance (less attorneys' fees and interest) of $382,484.92, after the application of all lawful offsets, payments, and credits. This consists of: (1) accounts receivable of $241,977.51; (2) work in progress of $51,873.06; (3) raw materials in the amount of $42,379.58; and (4) finished goods in the amount of $6,254.76. 1 C.R. 110, 113, 115, 137-38. When signed, PO 1682 specifically contemplated the production and sale of 5,000 black and white golf guru units at the unit price of

$128.95, for a total of $645,750.00 due to AMS by A-Pro. 1 C.R. 107. A-Pro was billed for and did make some payments to AMS, which were properly credited to the total outstanding amount due to AMS. 1 C.R. 121-34. Separated out, the black and white Golf Guru units balance is $281,633.89, comprised of the following amounts: (1) $230,432.62 in receivables; (2) $21,825.12 for work in progress; (3) $42,379.58 in raw materials; and (4) $6,254.76 in finished goods. 1 C.R. 77, 110, 113, 115, 137-38. The record contains robust testimony from A-Pro's agents and AMS' employees regarding these balances and their accuracy, and AMS' auditors further confirmed the amount. 2 R.R. 87 (testimony of Brad Scroggins, chief executive officer of AMS); 2 R.R. 201-211 (testimony of Iain Hurn, executive vice Wallace, chief accounting officer of AMS).

Appellants seize, once again, despite clear evidence in the record to the contrary, on a series of entries showing a "zero balance" for a PO 1682. Appellants' Brief at 29. In doing so, they ignore the history and context of the transaction between AMS and A-Pro. Trial Exhibits 81 and 82, relied upon by the Appellant Guarantors, make clear that the billing and delivery of the Golf Guru units manufactured for and delivered to A-Pro was further subdivided amongst several purchase orders reflecting each "take down" order. 1 C.R. 113, 119-20. These orders, none of which individually are for the full amount described in the Guarantees and in PO 1682, have been assigned a variety of numbers. 6 R.R. 50,

35

59, 62, 670, 673-80, 684, 687-90, 692, 727, 813, 816, 832, 852, 996, 1035, 1047, 1055. The silver bullet seized upon by the Guarantors is an obvious misinterpretation of a single purchase order, unfortunately also numbered 1682. 6 R.R. 650. Numbering aside, a close examination of this order reveals that it is entirely unrelated to the original PO 1682 defined above and encompassing the entire transaction. *Id.* This purchase order references only *1,000* golf guru units at a price of $133.08. *Id.* The amount due under that individual shipment and order, as reflected accurately in AMS' records, and as cited by the Guarantors, is $133,080.00. *Id.* It is manifestly clear that this is *not* the full sum of the *original* PO 1682 cited throughout the record, by the parties, and referenced in the Guarantees. *Id.* It is also plain that this *is* the PO 1682 Appellants claim has been satisfied, as both Exhibits 81 and 82 cited by Appellants reference a PO 1682 with an identical balance. 1 C.R. 113, 119-20. Those records simply do not prove or suggest that the entire $645,750.00 liability guaranteed by the Guarantors has been satisfied. *Id.* Thus, the Guarantors' argument must fail.

**B. The Satisfaction of One Purchase Order Does Not Excuse Appellants' Liability.**

Furthermore, Appellants cannot alter the nature of the transaction they guaranteed between A-Pro and AMS, and thus their liability, by relying on these subsequent purchase orders. Because guarantees are ancillary to transactions, a dispute regarding the rights of a guarantor can only be determined by reference to

the rights of the parties to the underlying transaction. *Pham v. Mongiello*, 58 S.W.3d 284, 288 (Tex. App.—Austin 2001, pet. denied). It is the terms of the underlying transaction that give rise to the guarantor's liability. *Rep. Nat. Bank of Dallas v. Nw. Nat. Bank of Fort Worth*, 578 S.W.2d 109, 114 (Tex. 1978); *Cox v. Lerman*, 949 S.W.2d 527, 530 (Tex. App.-Houston [14th Dist.] 1997, no pet.). Here, it is clear that the underlying transaction, and thus the Appellant Guarantors' liability, was for 5,000 golf guru units at $128.95, as referenced in PO 1682. 6 R.R. 26-30.

Exactly *how* the transaction occurred between the parties, *how* it was actually conceived of and executed, from ordering, invoicing and payment is essential. Each of these fundamental facts have already been considered and determined by the Trial Court. In September 2007, A-Pro received a quote from AMS. 6 R.R. 668. A-Pro decided to place an order for 5,000 black and white units with the original PO 1682. 3 R.R. 175-84; 6 R.R. 26. This order is dated October 9, 2007. 6 R.R. 26. A-Pro did not have any credit, so the Guarantees, also dated October 2007, were required for this order. 3 R.R. 112-14. The Guarantees were entered into in October of 2007. 6 R.R. 27-30. Each Guarantee references PO 1682. *Id.* At the time, the *only* PO 1682 in existence was the *original* PO 1682, reflecting the transaction guaranteed by the Guarantors as 5,000 black and white Golf Guru units at $128.95 each. 3 R.R. 175-84.

The *original* PO 1682 of 5,000 units was filled subsequently through a variety of individual "take down" purchase orders, all numbered by A-Pro. 3 R.R. 146-48, 180-85; 6 R.R. 692, 813, 816, 832, 852, 1047. Subsequent to the Guarantors signing the Guarantees, A-Pro issued another purchase or "take down" order of 1,000 golf guru units. This was because the Guarantors elected to order 1,000 units at a time, reflecting the separate price point. 3 R.R. 182-84; 6 R.R. 648-50. The Guarantors actually discussed this amongst themselves. 6 R.R. 421-22 (e-mail correspondence in September 2007 discussing the need for a firm purchase order for 5,000 units backed by personal guarantees prior to AMS beginning work). They confirmed it again when they received AMS' demand. 6 R.R. 648 (discussing the two PO 1682s). AMS's invoices corresponded to the individual purchase order numbers generated by A-Pro. *Id.*

The "second" PO 1682, as one of the first "take down" orders of the entire transaction was thus one of the first purchase orders billed and to which A-Pro's payments were credited. 5 R.R. 29-31. Billing was not referenced back to the *original* PO 1682 created in October, but instead to the individual take down orders placed by A-Pro. 5 R.R. 30-31 ("Q: Thank you. Now, can you also explain to the Court why it says purchase order 1007 or any other number of purchase orders but it doesn't relate – but it never says [blanket] purchase order 1682? A: Well, purchase order 1682 is a blanket purchase order that sort of sets everything

38

up and allows AMS to order all of the product. And then the takedown POs, we were just issuing them out of Quickbooks. And Quickbooks automatically assigns a number to them."); 5 R.R. 23-24 ("Q: And can you explain to the Court exactly how PO 1682 was used in conjunction with the takedown orders? A: Well, PO 1682 was a blanket PO that was intended to cover 5,000 golf guru units. And when we needed product, we would give AMS a takedown PO and AMS would ship us the product.")

Accordingly, the PO 1682 seized on by Appellants does *not* replace to the original PO 1682, created in connection with and referenced in their personal Guarantees. Instead, each PO in AMS' accounting records and contained in the Trial Court record relates to an individual takedown order generated by A-Pro, some of which A-Pro paid for, some of which it did not. The entries do not reflect the satisfaction of the original PO 1682, as one of the Guarantors acknowledged. 3 R.R. 192. As the Trial Court aptly recognized, the satisfaction of the second PO 1682 has no bearing on the actual transaction guaranteed by the Guarantors giving rise to their liability memorialized in the first and contemporaneous PO 1682.

Appellants have presented no compelling reasons why the Trial Court's Findings of Fact should be disturbed. Instead, they have merely cherry-picked individual portions of the record, already considered and rejected by the Trial

Court, which support their contentions only in complete isolation. This Court should reject Appellants' challenges to these Findings of Fact as without merit.

**V.     The Trial Court's Award of Attorneys' Fees to Plaintiff-Appellee was Reasonable, and Appellant Guarantors Show No Error on this Point.**

Appellants' crude attempt to "dine and dash"—that is, the breach of their Guarantees and their refusal to pay what they owe to AMS—has led directly to hundreds of thousands of dollars of legal expenses reasonably incurred by Appellee AMS, and the Trial Court correctly held that Plaintiff-Appellee AMS is entitled to recover its fees as the prevailing party pursuant to the Guarantees and Chapter 38 of the Texas Civil Practice and Remedies Code.

Under Texas law, reasonableness of a fee is determined by application of the *Arthur Andersen* factors: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill [required] to perform the legal service properly; (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered."

40

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (citing Tex. Disciplinary Rules Prof'l Conduct R. 1.04, reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West Supp. 2011) (Tex. State Bar R. art. X, § 9)) (quotations omitted).

Given the intransigence of the Appellant Guarantors, AMS's attorneys' fees and costs, and the amount thereof incurred to date, are amply reasonable and necessary under the circumstances of this case. AMS submitted extensive evidence in the Trial Court regarding the amounts of attorneys' fees and costs incurred and the actions taken by Plaintiffs' attorneys in the prosecution of the case, and the Trial Court correctly considered this evidence against the applicable factors set forth by the Texas Supreme Court in *Arthur Anderson*. 945 S.W.2d at 818; *see also Rapid Settlements, Ltd. v. Settlement Funding, LLC,* 358 S.W.3d 777, 786 (Tex. App.— Houston [14th Dist.] 2012, no pet.) (holding the court should consider *Arthur Anderson* factors, but such factors are not exclusive, and the court can also consider entire record in determining reasonableness). The Trial Court considered that evidence and found Appellants' fees to be reasonable. 1 C.R. 452.

Further, as the record reflects, no segregation of fees between claims is necessary or otherwise required in this case because the legal services provided to Plaintiff were necessary for all claims (and/or defenses) and are too intertwined for such fees to be segregated. *See Tony Gullo Motors I, L.P. v. Chapa,*

41

212 S.W.3d 299, 313-14 (Tex. 2006); 1 C.R. 379-86 (Fee Affidavit). When all the time spent on a claim for which attorneys' fees are not recoverable is inextricably intertwined with a claim for which attorneys' fees are recoverable, a party may recover its fees where, as here, the discrete legal services performed advanced both the recoverable and unrecoverable claim. *Tony Gullo Motors*, 212 S.W.3d at 313; *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997). AMS' attorneys' fees award and its amount, already significantly discounted from AMS' total fees in this case, advanced its very simple claims in this case against all Defendants because its claims against them—their liability under the Guarantees and to AMS—were fully intertwined. It is impossible to prove one without the other. Establishing the liability of A-Pro and TQI is essential to establishing the liability of the Appellants. Similarly, as Appellants' joint appeal makes clear, establishing liability against one Guarantor required the same time and effort as establishing liability against all Guarantors in this case.

AMS was forced to expend considerable time and money defeating A-Pro's affirmative defenses in order to prevail on its recoverable claims. As a result, AMS may recover the fees it incurred for work on both the recoverable claims and the defenses associated with those claims because the legal services involved advanced both claims. *Varner v. Cardenas,* 218 S.W.3d 68, 69 (Tex. 2007) (no segregation required when attorneys' services necessary both for affirmative claim

42

and defenses); *Clearview Props., L.P. v. Property Tex. SC One Corp.,* 287 S.W.3d 132, 143 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (no segregation required when attorneys' services necessary whether claim filed by itself or with others); *Broesche v. Jacobson*, 218 S.W.3d 267, 278 (Tex. App.— Houston [14th] 2007, pet. denied) ("We conclude the interpleader and defense of the counterclaim were inextricably intertwined because to prevail on its interpleader, TIE had to defeat the conversion counterclaim, and thus legal services to defeat the counterclaim advanced TIE's interpleader."); *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 507-09 (Tex. App.— Houston [14th Dist.] 2007, pet. denied) (providing that a party was not required to segregate attorneys' fees for its breach of contract claim and for time spent defeating affirmative defenses to that claim where the services performed advanced the recoverable breach of contract claim.).

The Trial Court correctly found that no segregation was necessary or proper in this case. 1 C.R. 449. Judgment against one Guarantor is impossible without judgment against all, just as judgment against A-Pro is necessary to invoke the Guarantors liability. Moreover, Appellants point to parties no longer in the suit as red herrings—the claims against former Defendants Optial I.P. Holdings, L.P. and Optimal Intellectual Property, Inc. ("Optial/Optimal") related directly to and advanced the claims against the remaining Defendants below, including the

43

Guarantors. 1 C.R. 77-81. In addition, Optimal/Optial were non-suited from the case prior to the bulk of any fees awarded to the Appellees being incurred. 1 C.R. 91. As a result, their presence has no bearing on the award of fees to AMS. If anything, the amount of the award is directly attributable to the variety of creative and late urged defenses pleaded and advanced by the Appellants throughout the case. *See* 1 C.R. 207.

For these reasons, the Trial Court correctly found the attorneys' fee award to AMS reasonable given the prolonged duration of this case and the complexity involved in achieving judgment. Appellant Guarantors point to no error of law by the Trial Court on this issue, and Appellee AMS's reasonable attorneys' fees are well supported by the record below.

## CONCLUSION AND PRAYER

It is unlawful and inequitable to "dine and dash" from a restaurant, and in the case at bar, the Trial Court entered a proper Final Judgment that prevents the Appellant Guarantors from engaging in the commercial equivalent of "dining and dashing." For the foregoing reasons, the Trial Court's judgment for Appellee—Plaintiff Austin Manufacturing Services I, LLC should be affirmed in all respects. Appellee Austin Manufacturing Services I, LLC also requests such additional relief against Appellee as it is entitled to in law or equity.

44

Respectfully submitted,

**DYKEMA COX SMITH**

*/s/ Christopher D. Kratovil*
Christopher D. Kratovil
State Bar No. 24027427
Email: ckratovil@dykema.com
1717 Main Street, Suite 4200
Dallas, Texas 75201
(214) 462-6400 - Telephone
(214) 462-6401 - Facsimile

Kristina M. Williams
State Bar No. 24078303
Email: kwilliams@dykema.com
111 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 703-6300 – Telephone
(866) 793-5834 – Facsimile

**COUNSEL FOR APPELLEE
AUSTIN MANUFACTURING
SERVICES, I, INC.**

**CERTIFICATE OF COMPLIANCE**

I certify that this Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 9,808 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

Dated:                    December 14, 2015

Certified By:          */s/ Kristina M. Williams*
                               Kristina M. Williams

**CERTIFICATE OF SERVICE**

In accordance with the Texas Rules of Appellate Procedure, I certify that a true and correct copy of this *APPELLEE'S BRIEF ON THE MERITS* was served upon the following counsel of record by this Court's electronic filing system on December 14, 2015:

Mike Truesdale
Law Office of Michael S. Truesdale PLLC
801 West Avenue, Suite 201
Austin, Texas 78701
512.482.8671
512.507.3812 cell
866.847.8719 fax
Email: mike@truesdalelaw.com

> */s/ Kristina M. Williams*
> Kristina M. Williams

4811-3687-1979.12
ID\WILLIAMS, KRISTINA - 106453\000002